U.S. CUSTOMS SERVICE, REGION
II, Petitioner,

v.

FEDERAL LABOR RELATIONS
AUTHORITY, Respondent,

National Treasury Employees
Union, Intervenor.

Cal. Nos. 163, 835, Dockets
83–4056, 83–4128.

United States Court of Appeals,
Second Circuit.

Argued Feb. 6, 1984.

Decided July 20, 1984.

Allan L. Martin, Washington, D.C. (U.S. Customs Service, Richard H. Abbey, Chief Counsel, Gary B. Landsman, Asst. Chief Counsel, and Dept. of the Treasury, Jordan A. Luke, Asst. Gen. Counsel, Washington, D.C., of counsel), for petitioner.

Matthew J. Wheeler, Washington, D.C. (Federal Labor Relations Authority, Ruth E. Peters, Sol., and Steven H. Svartz, Deputy Sol., Washington, D.C., of counsel), for respondent.

Lawrence K.G. Poole, Asst. Counsel, Atlanta, Ga. (National Treasury Employees Union, Lois G. Williams, Director of Litigation, Kerry L. Adams, Asst. Director of Litigation, and William Harness, Assoc. Gen. Counsel, Washington, D.C., of counsel), for intervenor.

Before LUMBARD and VAN GRAAFEILAND, Circuit Judges, and RE\*, Chief Judge, U.S. Court of International Trade.

VAN GRAAFEILAND, Circuit Judge:

The United States Customs Service, Region II (the Service) seeks review of a decision and order of the Federal Labor Relations Authority requiring the Service to bargain with the National Treasury Employees Union (the Union) concerning so-called "crediting plans." Crediting plans are used by the Service in making promotion decisions, and measure the extent to which applicants possess the qualifications

---

\* Sitting by designation.

required for successful performance in the positions to be filled. For reasons hereafter discussed, we set aside the FLRA's decision and deny enforcement of its order.

In 1978, Congress, concerned that the merit principles of federal civil service were being threatened by the "welter of inflexible structures" and unnecessary bureaucratic procedures that had developed in the federal system, enacted the Civil Service Reform Act of 1978. *See* S.Rep. No. 969, 95th Cong., 2d Sess. 3, *reprinted in* 1978 U.S.Code Cong. & Ad.News 2723, 2725 [hereinafter paginated to 1978 U.S. Code Cong. & Ad.News 2723]. Prior to that time, examinations for jobs in the career service were conducted almost exclusively by the Civil Service Commission, and this increasingly burdensome undertaking was not being performed effectively. *Id.* at 2727–28. The solution arrived at by Congress was decentralization. *Id.* at 2728.

The Office of Personnel Management (OPM), which was created to take over the personnel management duties of the Commission, was authorized to delegate its personnel functions to individual agencies, which, however, were prohibited from taking personnel actions that were contrary to law or OPM regulations. *Id.* at 2728. Section 3 of the 1978 Act, which is codified as a note to 5 U.S.C. § 1101, states the Government's policy to be that

> the function of filling positions and other personnel functions in the competitive service and in the executive branch should be delegated in appropriate cases to the agencies to expedite processing appointments and other personnel actions, with the control and oversight of this delegation being maintained by the Office of Personnel Management to protect against prohibited personnel practices and the use of unsound management practices by the agencies.

This policy was effectuated in 5 U.S.C. § 1104, which provides for delegation of authority without relieving the OPM director of his responsibility "to prescribe regulations and to ensure compliance with the civil service laws, rules, and regulations." Subsection (c) of section 1104 provides in substance that any personnel action taken by an agency pursuant to its delegated authority is subject to cancellation by OPM if contrary to any law, regulation, or standard issued by OPM. *See* S.Rep. No. 969, *supra,* at 2749.

In enacting the 1978 Act, Congress recognized that "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a). It therefore provided that, while agency management shall have the authority to "determine the personnel by which agency operations shall be conducted" and to fill positions by making selections for appointment from "among properly ranked and certified candidates for promotion; or any other appropriate source", *id.* § 7106(a)(2)(B) & (C), the agency will not be precluded from negotiating with a labor organization the "procedures which management officials of the agency will observe" in exercising such authority, *id.* § 7106(b)(2). It is in the light of the above-described statutory background that the issue now before the Court must be examined.

Agencies which are contemplating the promotion of employees must scrutinize the applicants to determine both their basic eligibility and their relative qualifications for the new position. Basic eligibility is determined by reference to minimum qualification requirements established by OPM and supplemented by such additional selective factors as the agency involved has deemed appropriate. Once it has been determined which candidates are basically qualified, the candidates' qualifications are evaluated to determine who is the best qualified for the position. This is done by means of a crediting plan.

A crediting plan consists of a set of evaluation criteria which reflect the specific knowledges, skills, abilities, and other characteristics (KSAOs) deemed necessary for the successful performance of a particular job. The crediting plan establishes different levels for the several criteria, each level corresponding to a different de-

gree of actual or expected competency in terms of the particular criterion being measured. Each level is defined by reference to written descriptions of certain specific experiences, training, achievements, or test scores, and is assigned a rating value. Based on the cumulative score of the ratings for all evaluation criteria, the candidates can be ranked as to their comparative qualifications for a position.

Both the Customs Service and OPM believe that skilled professional help is needed for the formulation and validation of adequate crediting plans. In Customs Issuance 41335-05, in which the Customs Service stated its requirement that all personnel offices develop written crediting plans, the agency stated:

> Crediting Plans are developed by personnel specialists with the assistance of subject matter experts or someone knowledgeable in the functional area of the position being filled.

OPM regulations also dictate the use of "subject matter experts" to analyze the duties and responsibilities of the job to be filled and personnel specialists to identify the KSAOs necessary to perform the job, OPM Training Manual 22 FH 1980, and OPM warns that "[p]rogram effectiveness is largely dependent on the extent to which personnel specialists are able to apply appropriate job analysis procedures and psychometric principles in these activities," FPM Supplement 335–1. OPM states that agencies need a "continuing specialized capability in personnel measurement". It suggests that larger agencies may need to establish a permanent group "with extensive training or experience in personnel measurement areas" and that smaller agencies "may choose to maintain one such position or to establish a capability based on a combination of inservice and contract or consultation resources." *Id.* The OPM training manual requires that each crediting plan must be in writing and must include:

> Identification of those subject matter experts and personnelists who participated in development of the plan (*i.e.*, title,

series, grade, years of experience, and any specialization in the field which would clarify the frame of reference on which the crediting plan was based).

Despite the concerted emphasis on professionalism and specialization evidenced in the foregoing review, the Union insists, and the FLRA agrees, that the Service is required by law to negotiate with the Union the contents of its crediting plans for the positions of Import Specialist GS 5/7 and Customs Inspector GS 9/11. We disagree.

In deciding whether this Court should accede to the FLRA on this issue, one of the things we must determine is whether the FLRA erred in applying the "acting at all" standard to the facts of this case. If the underlying standard upon which the FLRA relied is not in accordance with law, its order cannot stand. *See H.W. Wilson Co. v. United States Postal Service,* 580 F.2d 33, 37 (2d Cir.1978); *Sovich v. Esperdy,* 319 F.2d 21, 26–27 (2d Cir. 1963); *Wheatley v. Adler,* 407 F.2d 307, 310 (D.C.Cir.1968).

The "acting at all" standard originated in section 7218(b) of the Senate Bill, which provided that negotiations on procedures governing the exercise of authority reserved to management should not unreasonably delay the exercise by management of its authority, and any negotiations on procedures governing matters otherwise reserved to agency discretion may not have the effect of actually negating the authority reserved to the agency. *See Joint Explanatory Statement of the Committee on Conference,* House Conference Report No. 1717, 95th Cong., 2d Sess. 158, *reprinted in* 1978 U.S.Code Cong. & Ad.News 2860, 2892. Although the Conference Report deleted this provision, the conferees emphasized specifically that negotiations on procedures should not be conducted in a way that prevents the agency from acting at all. *Id.* This interpretation of the standard was recognized by the FLRA in *National Treasury Employees Union (Union) and Internal Revenue Service, New Orleans District Office (Activity),* 1 F.L.

R.A. No. 102 (1979), where the Authority held that unions were entitled to negotiate fully on procedural matters "unless such negotiations would prevent the agency from acting at all."

In short, the "acting at all" standard deals with the process of negotiation, not, as here, with its end product. Any other interpretation of the standard would require the parties to predict the outcome of negotiations before they begin.

The FLRA also clearly erred in holding that crediting plans proposed by the Union would "not restrict in any manner management determinations as to [the personnel by which Agency operations shall be conducted]" and that "such plans would be used only to rate and rank ... qualified candidates and would not be used to eliminate any candidate from further consideration for selection." Counsel for the FLRA does not attempt to support this holding, retreating instead to the novel argument that the development of crediting plans is not a precise science and that the Service has not indicated how the Union's plans will prevent the best qualified candidates "in the hypothetical sense" from being presented to management for selection. Both the Union and the Service recognize that advancement in federal service must be determined solely on the basis of relative ability, knowledge, and skill, 5 U.S.C. § 2301(b)(1), and that the right of Customs officials to choose personnel for advancement is limited by the rule that such officials may only fill a position from those promotion applicants who are best qualified, 5 C.F.R. § 300.102. In contradistinction to the FLRA's holding that the Union's plans "would not be used to eliminate any candidate from further consideration for selection", the Union states, "The elimination of candidates is an inevitable result of the OPM requirement that a selecting official must select promotion applicants placed on the Best Qualified List through objective evaluation procedures." Union's Br. at 20–21.

The FLRA relies on section 7106(a)(2)(C)(ii) to support its holding under its "acting at all" standard that the Union's plan would not prevent the agency from acting at all, because this subsection permits the selection of qualified candidates from "any other appropriate source". This construction of section 7106(a)(2)(C)(ii) violates a well-established rule of statutory interpretation. "The word 'or' in the statute is not a fertile word which is subject to varied constructions." *United States v. Newman*, 405 F.2d 189, 197 (5th Cir.1968). When "or" is inserted between two clauses, the clauses are treated disjunctively rather than conjunctively. *United States v. Astolas*, 487 F.2d 275, 279 (2d Cir.1973), *cert. denied*, 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974); *United States v. Gollin*, 176 F.2d 889, 893 (3d Cir.), *cert. denied*, 338 U.S. 848, 70 S.Ct. 89, 94 L.Ed. 519 (1949). If section 7106(a)(2)(C) is interpreted in this correct manner, it must be read to provide that management shall have the authority to make selections for appointment from "among properly ranked and certified candidates for promotion" and, disjunctively, that management shall have the authority to make selections from "any other appropriate source." Each subsection must be considered separately; subsection "i" may be violated although subsection "ii" is not. *See United States v. Lane*, 464 F.2d 593, 595 (8th Cir.), *cert. denied*, 409 U.S. 876, 93 S.Ct. 127, 34 L.Ed.2d 129 (1972). This interpretation of the statute is supported by section 7106(a)(2)(B), which provides that management shall have the authority "to determine the personnel by which agency operations shall be conducted." Correctly read, this clause means that management may determine which candidates shall be promoted to an office in which a more demanding level of operations is being conducted.

■ The purpose of a crediting plan is to generate a list of candidates who are best qualified for the more-advanced position. The measurement devices, established for each crediting level under each criterion, functionally define the KSAOs which management has determined are necessary for successful performance in a particular posi-

tion. If a measurement device does not measure accurately the degree to which a candidate possesses a required KSAO, management is deprived of its right to choose personnel possessing the knowledge, skills, and abilities which management deems necessary for the position. Moreover, to the extent that a measurement device does not accurately measure the degree to which a candidate possesses a desired KSAO, it may substitute for that KSAO some other knowledge, skill, ability, or characteristic.

We conclude that the measurement tools included in crediting plans are integrally connected to the skills, knowledges, and abilities which are being sought in a candidate for a position. Therefore, the crediting plans are a part of management's substantive decision as to what KSAOs the successful performance of a position requires. Imposing an obligation to bargain concerning the content of the plans interferes with management's reserved right to determine the personnel who will conduct agency operations.

We are not persuaded that the legislative history of the Civil Service Reform Act dictates a different result. Both the FLRA and the Union have argued to this Court that the following statement made by Representative Udall during House debate supports the FLRA's decision:

> [Section 7106(a)(2)(C) is designed] to preserve as bargainable (to the extent permitted by applicable laws and regulations) the standards, criteria, and procedures for establishing promotion certificates, while assuring management's right to make the actual selection from the certificate ....

124 Cong.Rec. 29174 (1978).

The Court of Appeals for the District of Columbia, in considering the above-quoted statement, noted that the employee participation to which Congressman Udall referred was that which was provided for by the *Federal Personnel Manual* then in effect. *American Federation of Government Employees v. FLRA*, 691 F.2d 565, 571 (D.C.Cir.1982), *cert. denied*, —— U.S.

——, 103 S.Ct. 2085, 77 L.Ed.2d 297 (1983). In the words of the Court, "[t]he Manual provided that employee consultation and negotiation did not extend to qualification standards or evaluation methods, or to the exercise of rights reserved to management by executive order, including assignment of duties to employees." *Id.* We believe the District of Columbia Court's interpretation is correct. Moreover, we note that even Congressman Clay, an ardent supporter of the right of federal employees to bargain collectively, stated that proposals which "directly and integrally go to the specified management rights" are non-negotiable. 124 Cong.Rec. 29187 (1978). The proposals at issue are directly and integrally related to management's right to determine its personnel and, as such, are not proper subjects of bargaining.

The Civil Service Reform Act gives the FLRA the authority to resolve issues relating to the duty to bargain in good faith under the Act, 5 U.S.C. § 7105(a)(2)(E), and its determination as to which issues are negotiable will not be overturned by this Court unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). Because we conclude that requiring the Service to bargain with the Union over the contents of crediting plans would interfere with rights reserved solely to management under the Act, we set aside the FLRA's determination as not in accordance with law.

The petition for review is granted. The FLRA order is set aside and enforcement is denied.