# ·SUNFLOWER OIL COMPANY *v.* WILSON.

## SAME *v.* SAME.

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF MISSISSIPPI.

Nos. 122, 123.   Argued and submitted December 15, 1891. — Decided January 4, 1892.

An oil company contracted with a railway company to purchase certain rolling stock and lease the same to· the railway company at an agreed rental, the latter agreeing to purchase the same on or before a given day and pay for it in cash, or if it should be unable to do so to turn it over to the oil company, at the expiration of the contract, in good order and condition. It was further agreed that freights earned by the railway by transportation for the oil company might be applied to the payment of the rental and of the purchase money. The railway company was insolvent and, before the expiration of the contract, its mortgage bondholders had proceedings instituted in equity for the foreclosure of their mortgage, in which W. was appointed receiver. The receiver continued to use the rolling stock. The oil company intervened, claiming to recover from the receiver the balance of the purchase money, and to secure the carrying out of the contract by the receiver, and the retention by it of the amount of freights due from it, and their application to the payments of the rent and the purchase money. The receiver answered, declining to complete the contract, and averring that the rental had been paid in full and that there was a balance due him for freight. He also· filed a cross-petition to recover the surplus. *Held*,

(1) That the contract provided that if the railway company became unable to pay its current debts in the ordinary course of business, it should be released from its obligation on returning the property;

(2) That the receiver had the right to return the property, upon complying with the terms of the contract in respect thereto;

(3) That, notwithstanding the absence of a provision in· the contract forfeiting payments already made, in case of failure to complete · the purchase, it was open to doubt whether an action at common law would lie to recover such payments;

(4) That the dismissal of the intervening petition did not necessarily involve the dismissal of the cross-petition, and that the court might do full justice between the parties;

(5) That the receiver was as much entitled to recover the money due upon the contract made with the railway company as with himself;

(6) That as between the railway company and the receiver, the latter was entitled to the money, subject to any valid set-off of the oil company.

THE court stated the case as follows:

This was an intervening petition by the Sunflower Oil Company to enforce the specific performance of a contract by the railway company to purchase certain engines and cars until a balance of $6732.15 claimed to be due should have been paid and discharged; and a cross-petition by the receiver to recover freights earned, in the sum of $10,258.86, in excess of the rental of such engines and cars.

The case arises upon the following facts: In 1877 the Mobile and Northwestern Railway Company, for the purpose of raising money to build its road, executed a trust deed upon all its property in the amount of $250,000, to secure a series of bonds in that amount, to be negotiated. The railway company made early default in the payment of its interest upon these bonds, but, notwithstanding its default, the bondholders suffered the property to remain in its hands, and under the uninterrupted control and management of the company, until November 15, 1886, when the original bill in this case was filed. During the continuance of such default, and in January, 1883, the president of the railway company contracted with the Baldwin Locomotive Works for two locomotives at a cost of $7600 each, to be completed in the autumn of that year. Just preceding their completion, the only locomotive the railway then had became permanently disabled, and though the new locomotives ordered were nearing completion, the company had no money, nor means of raising money, to pay for them. In this strait, the bondholders being unwilling to extend their assistance, application was made to the Sunflower Oil Company, appellant, for the means necessary to purchase the rolling stock, and avert a total suspension of the company's business. Under these circumstances a contract was executed, October 6, 1883, between the oil company and the railway company to the following effect: The oil company agreed to purchase from the Baldwin Locomotive Works two

locomotives and tenders complete, named, respectively, La Flour and Yazoo, at the price of $7600 each, and to invest the further sum of $2400 in box and flat cars, and to lease the same to the railroad to January 1, 1886, for $1408 per annum, payable in monthly instalments. This was exactly 8 per cent upon the amount invested. The La Flour and the cars were to be paid for by the oil company in cash, and were at once to be and to continue its property until purchased by the railway company in the manner hereinafter provided. The Yazoo was to be purchased upon the obligation of the railway company, payable in six months from date, guaranteed by the mercantile firm of Fargason & Co. of Memphis, which guaranty the oil company agreed to procure; and until payment the title to the Yazoo was to remain in the Baldwin Locomotive Works. Should the railway company pay the obligation at maturity, the title to the engine was to vest in it, but should the same be paid by Fargason & Co. the title was to be and remain in the Sunflower Oil Company until the railway company should acquire title to it and the other property in the manner hereinafter set forth. Should the railway company promptly meet its obligation to the locomotive works for the Yazoo, then the rents payable to the oil company were to be reduced to $800 per annum, payable monthly. The railway company agreed to take all proper care of the rolling stock, and turn the same over in good order to the oil company at the end of the contract, " should said railroad company be then unable to purchase the same, at the price hereinafter mentioned," and agreed to use the same upon its line of road, and to turn the same over at the demand of the oil company, should it at any time violate its agreement.

The railway company further agreed that it would, on or before January 1, 1886, purchase all said property from the oil company, and pay for it in cash at the cost price, and should also have the right at any time before that date to purchase the whole by paying the cash price thereof, in which event the contract for rent should immediately cease and determine, but the other terms of the contract were to remain unimpaired. The railway company further agreed that it

would erect houses at several of its depots for the purpose of receiving cotton seed in bulk for the oil company, and would provide scales for weighing seed, and would haul seed in bulk from various points along the line of its road for the oil company; that the agents of the railway company would weigh the cotton seed and purchase the same, if desired, free of cost for any such services; that it would haul all sacks for the oil company free of charge; that it would receive and haul all freights for the oil company at the Mississippi River, opposite Helena, free of charge for storage or commission; and that the freight paid should be at reasonable rates to be fixed at various times by the presidents of the two companies, but the freight on seed in bulk was not to exceed $1.75 per ton, and that on seed in sacks was not to exceed $2.00 per ton. It was further agreed that the railway company would not haul cotton seed in bulk for any other corporation or person, nor permit its agents to purchase or pay for cotton seed for any other corporation or person, and that it would give all needed facilities and preferences to the oil company to enable it to control all the cotton seed along the line of its road, "as it now is, or as it may be while this contract is in force." All freights earned were to be credited on the rental of the property, and should there remain a surplus after paying the rent, it was to remain in the hands of the oil company and go as a credit upon the purchase-money of said property; interest was to be allowed said railway company on said surplus at the rate of 8 per cent per annum. The railway company was to furnish a monthly statement of freights at the end of each month, while the contract continued, to be credited in the manner above stated. The contract was to continue in force until January 1, 1886; and on this day, January 1, 1886, a further contract was made extending the time for one year from that date, for the purchase by the railway company of such engines and cars.

In November, 1886, Moses H. Katzenberger and others, holders of a majority of the bonds, filed a bill in the District Court of the United States for the Northern District of Mississippi to enforce a sale of the property and franchises covered by the trust deed, and praying for a receiver pending the pro-

ceedings. Subsequently the bill was amended, and on December 16, 1886, Benjamin Wilson, the defendant and appellee in this case, was appointed receiver of the company. Having duly qualified the receiver took charge of the road and began to operate the same under the orders of the court, using the rolling stock under an arrangement for that purpose. The same day the receiver was appointed an order was made that the receiver continue any existing contract for the purchase or use of the rolling stock then used on said road until, for sufficient cause shown, such contract should be annulled. A subsequent order permitted him to "make any change in the contract heretofore existing" in relation to the rolling stock.

On February 14, 1887, the Sunflower Oil Company, appellant, which was not a party to the original bill, interposed by petition, setting up its contract with the railway company, alleging a balance due it of $6732.15 on the purchase of said engines and cars, and praying that the receiver be required to carry out the terms of said contract, by continuing to carry freights for the appellant, and by allowing it to retain all moneys due or to become due the receiver for such services, as credits on such rental and purchase-money accounts, until the full indebtedness of the railway company was discharged. The receiver answered, denying that the railway company had ever made any binding contract to purchase such rolling stock, and that the contract was a contract of rental with a mere option to buy; that appellant had retained of the freights earned by said railway, the sum of $10,258.86, in excess of the agreed rental of the property, and for the recovery of the same, filed his answer in the nature of a cross-petition. The court was of the opinion that the relation between the parties was one of lessor and lessee, and decreed that the oil company pay to the receiver the amount above named, being the excess of the earnings of the road in the hands of the oil company over the amounts due for rents. From that decree the first appeal was taken. At the same time an account was taken of the amount due the receiver for the surplus of freights earned by the railroad while in his hands, over the rents due the oil company during the same period, which

resulted in a further decree against the oil company, in favor of the receiver, for $3729.82. From that decree the second appeal was taken to this court.

*Mr. John W. Cutrer* and *Mr. William D. Cutrer* for appellant.

The receiver, appointed at the suit of the bondholders, after the death of the trustee, and acting for their benefit, did not have conferred on him any power to sue for, nor to recover, property and assets *not covered by the terms of the trust deed;* and earnings of a railroad company, though named in the trust deed, are not covered by it, and do not accrue for the benefit of the creditors secured thereby, while the railroad property remains in the possession of the mortgagor. *Freedman's Saving & Trust Co.* v. *Shepherd,* 127 U. S. 494.

Although the power to sue for this class of railroad property or assets may have been sought to be conferred on the receiver by the order making the appointment, we contend that the effort was vain, and that the receiver did not acquire thereby a legal right to sue, nor any authority to recover. The earnings of a railway company sufficient to provide for the operation of its road and the surplus belong to the company, subject to its sole control; *Gilman* v. *Ill. & Miss. Tel. Co.,* 91 U. S. 603; and those who receive any part of such earnings before the appointment of a receiver, are not bound to account for them, to any mortgage bondholder, nor to any person suing for him, or in his behalf. *Galveston Railroad* v. *Cowdrey,* 11 Wall. 459.

The decisions upon contracts of this character are numerous in England and America. Many recent cases hold that where it is apparent that the contract, though nominally a *hiring,* is, in reality, a conditional sale, the courts will so regard it, looking to the substance rather than the form. Benjamin on Sales, §§ 393, 425–433; *Hervey* v. *R. I. Locomotive Works,* 93 U. S. 664. The intention of the parties, and the practical construction placed by them upon their contracts, prevail in every instance over the mere language of the instrument. *Donahoe*

v. *Kettrell,* 1 Clifford, 141; *Irwin* v. *United States,* 16 How. 523; *United States* v. *Gibbons,* 109 U. S. 200; *Mobile &c. Ry. Co.* v. *Jurey,* 111 U. S. 592; *Harkness* v. *Russell,* 118 U. S. 663; *Topliff* v. *Topliff,* 122 U. S. 122; *District of Columbia* v. *Gallagher,* 124 U. S. 505.

This being true, the contract stands before the court, as stated, as, in effect, a *conditional sale,* with a right of rescission on the part of the *vendor,* in case the purchaser shall fail in payment of the purchase money. The vendor, however, has never sought rescission, but by its suit insists that the purchaser shall comply with and complete its obligation to purchase, by the continued making of payments which it is entirely able to make and to meet.

There is a manifest distinction, well stated by the authorities, between a hiring or lease, with the *privilege* or *option* to the lessee to purchase, and possession, as in the present instance, under a contract of *conditional sale, or unconditional undertaking to purchase.* The language of the contract is plain and unaccompanied by any limitation of the obligation or liability assumed. "The said railroad company further *agrees that it will, on or before the said 1st day of January,* 1886, *purchase all of said property from said oil company, and pay for it in cash the cost price thereof.*" This clause immediately succeeds the clause from which counsel have evolved their conception of the option contended for, as though it were, thereby, purposely intended to exclude from the contract and wholly preclude any such doubt or hypothesis as that they assert.

Proceeding upon the hypothesis that the contract cannot be construed as an option, without force as against the railway company, but is, instead, an obligation enforcible on the demand of the oil company, we submit that the means adopted by the parties to effect the discharge of such obligation, is. exactly in the line of what the law itself would have provided if no contract had been made. The railway company had ample authority to pledge its earnings, and to execute a contract, hypothecating a particular portion of them for the discharge of appellant's claim. Mississippi Rev. Code (1880) c.

38, §1033; Jones on Railway Securities, §§ 114–120; *Teal* v. *Walker*, 111 U. S. 242; *Sage* v. *Memphis & Little Rock Railway Co.*, 125 U. S. 361; *Freedman's Savings Co.* v. *Shepherd*, 127 U. S. 501. The pledge was intended to cover only enough to meet the actual cash cost price of the rolling stock. And when the receiver was appointed he took the road, its property, including under the express order of the court this rolling stock and its income, subject to that pledge, and he was bound to respect it.

As to the cross-petition, there are no authorities which will warrant retaining it for the rendition of a personal money judgment, or that will sustain such a judgment when rendered, where the court, on final hearing on the merits, dismisses the original bill, refusing to grant any relief upon it. The rule in Mississippi is the same as that established by this court; and there can be no exception in principle or practice, engrafted on it, that can be made to embrace and save the judgment in this cause. *Cross* v. *Valle*, 1 Wall. 1; *Dows* v. *Chicago*, 11 Wall. 108; *Gilmer* v. *Felhour*, 45 Mississippi, 627; *Jacks* v. *Bridewell*, 51 Mississippi, 881; *Belcher* v. *Wilkerson*, 54 Mississippi, 677; *Wright* v. *Frank*, 61 Mississippi, 32.

*Mr. Holmes Cummins* and *Mr. Edward Mayes*, for appellee submitted on their brief.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

(1) This case turns upon the construction of the contract of October 6, 1883, between the Sunflower Oil Company and the Mobile and Northwestern Railway Company, the substantial provisions of which were that the oil company should purchase of a manufacturer certain rolling stock, which it should lease to the railway company at a rent equal to 8 per cent upon the cost price, the latter agreeing to purchase the same of the oil company on or before January 1, 1886, and pay for it in cash, with a proviso that, in case it should be unable to purchase the same, it should turn it over to the oil company in good order and condition, at the expiration of the contract.

There is no doubt of the general proposition that mere inability to pay is no defence to the performance of a contract, or to a promise to pay. A person making purchase of an article is conclusively presumed to intend to pay for it, and to have had his ability to pay in contemplation when he made the purchase; and, if this proviso had not been inserted, no doubt could have arisen regarding the proper interpretation of this contract. But here was a contingency carefully introduced into this contract, upon the happening of which the railway company was to be discharged of its obligation to the oil company by returning to it the rolling stock in good order and condition. We are bound to assume that this provision was inserted for some purpose, and are bound to give it its proper effect. At the time the contract was entered into, the railway company was financially embarrassed; its only locomotive had been crippled beyond repair; and it had neither money nor credit with which to purchase another. In this extremity it entered into negotiations with the oil company, which was itself desirous of increasing its facilities for obtaining cotton seed, and a monopoly of that article along the line of said road. But in making the advance necessary to secure the requisite amount of rolling stock, the oil company naturally sought to protect itself in every possible way against loss. This it did, (1) By retaining to itself the title and ownership of such rolling stock until the same should be fully paid for: (2) By leasing it to the road at a rental equal to 8 per cent upon the value of the property: (3) By retaining the freights due the road for carriage of cotton seed, and crediting them, first, upon the rent, and, second, upon the purchase price of the property: (4) By providing for the return of the property in good order and condition, in case the road was *unable to purchase* the same for cash by January 1, 1886, subsequently extended to January 1, 1887. The last was a proviso doubtless inserted out of abundant caution, in order to put beyond question the return of the property in case the road should fail to pay for it in full before the expiration of the contract. Under these circumstances, we find it difficult to give these words any other than their ordinary meaning, viz., that if the

railway company became so deeply involved as to be unable to pay its current debts in the ordinary course of business, it should be released from its obligation upon returning the property. In ordinary speech, a person is said to be unable to make a purchase when he has neither money nor credit sufficient for that purpose, though the entire value of his assets may be greater than the purchase price of the property. It is unnecessary to decide, however, whether the proviso in question created a mere option, or whether anything less than the total insolvency of the company constituted an inability to purchase within the meaning of the contract, since the appointment of a receiver at the suit of bondholders seems to be most conclusive evidence of inability to carry out its contracts, and, indeed, to have been the very contingency contemplated in the proviso. It is unnecessary even to decide whether this inability to purchase could be asserted at all by the railway company, since the defence in this case is set up by the receiver acting in the interest of all the creditors, and claiming that, in view of the insolvency of the company, the oppressive character of the contract and the greatly reduced price at which he could secure similar property, payment ought not to be compelled from the funds in his hands.

The receiver did not simply by virtue of his appointment become liable upon the covenants and agreements of the railway company. High on Receivers, § 273; *Hoyt* v. *Stoddard*, 2 Allen, 442. Upon taking possession of the property, he was entitled to a reasonable time to elect whether he would adopt this contract and make it his own, or whether he would insist upon the inability of the company to pay, and return the property in good order and condition, paying, of course, the stipulated rental for it so long as he used it. *Turner* v. *Richardson*, 7 East, 335; *Commonwealth* v. *Franklin Insurance Co.*, 115 Mass. 278; *Sparhawk* v. *Yerkes*, ante, 1. Of course, if he elects to take property subject to a condition, he is bound to perform the condition before he can obtain title to the property. He may, however, decline to assume this obligation, and return the property to the purchaser, upon complying with the terms of the contract with respect to such return. The case is not

unlike that of *Express Company* v. *Railroad Company*, 99 U. S. 191. In that case the express company agreed to loan the railroad company $20,000 upon its notes, to be expended in repairs and equipments. In consideration of this the railroad company agreed to provide the necessary privileges and facilities for the transaction of all the business of the express company over its road; and to charge a certain sum for transportation, which was to be credited monthly toward the payment of the loan, with a proviso that if the loan were not paid within a year, the contract should continue in force for a further period, or until the whole had been repaid. A mortgage upon the road having been foreclosed, the receiver repudiated the contract, forbade the express company from further using the cars of the railroad company, unless upon conditions whereby the contract was virtually surrendered or ignored, and the express company was compelled to abandon the road, although the money loaned, with a portion of the interest thereon, was still due and unpaid. It filed a bill for specific performance, alleging that the railroad company having conveyed away its property, and being in part insolvent, the violation of the contract could not be compensated by any damages that might be recovered at law. This court dismissed the bill, holding that, as the plaintiff had no lien, and the contract was simply for the transportation of persons and property, the court could not require either a specific performance by the receiver, or the satisfaction of the plaintiff's demand by money; and that the express company had, therefore, no standing in a court of equity.

The case of *Coe* v. *New Jersey Midland Railway*, 27 N. J. Eq., (12 C. E. Green,) 37, is also instructive in this connection. In that case, the Rhode Island Locomotive Works Company entered into an agreement with the railway company to furnish the latter certain locomotives and tenders, as upon lease, but with the agreement that, upon payment in full of the rent reserved, they should become the property of the railway. The rent was payable in instalments, for which the company gave its notes; at the time of the appointment of the receiver there was due for rent about $120,000; and the locomotives

were then in possession of the receiver and in use upon the road. Petitioners based their claim to relief upon the ground that the receiver requested them to leave the locomotives in his possession, for use on the road, he guaranteeing to keep them in good order, and promising to apply for authority to pay the claim. In defence, the receiver alleged a notice by bondholders not to pay the rent or deliver the certificates therefor, which had been issued upon his application, because the property was not worth the amount agreed to be paid, and it was not for the interest of the trust that the rent should be paid. It was held that petitioners had no equity arising from the conduct of the receiver to have the contract specifically performed, without regard to the advantage or disadvantage of the trust fund; that although they appeared to be willing up to the time they were warned not to do so, to pay for the property according to the agreement, it might have been an improvident act on their part; that the fact that the receiver had applied for leave to issue the certificates to pay the rent did not bind them; and that the court would not grant the prayer of the petitioners until satisfied that it was for the interest of the trust that it should be done; but that the petitioners would be allowed just compensation for the use of the property while held by the receiver.

(2) Notwithstanding the absence of a provision in the contract forfeiting payments already made, in case of failure to complete the purchase, it is open to doubt whether an action at common law would lie to recover such payments. The courts of Massachusetts, Maine and Illinois hold that partial payments are forfeited; while those of Connecticut, Michigan, Minnesota and Georgia hold that, upon equitable grounds, the buyer is entitled to a return of the money. There seems to be no doubt, however, that a court of equity may require the return of the money paid, less the amount of any damage sustained to the property, and a reasonable compensation for the use of the same, particularly if there be a clause in the contract providing that upon a certain contingency the property shall be returned to the seller.

(3) Under the circumstances of this case, and in view of the

fact that a court of equity takes jurisdiction of all questions with respect to this property as ancillary to its jurisdiction over the main case, the dismissal of the intervening petition does not necessarily involve a dismissal of the cross-petition, and the court, having jurisdiction of the entire proceeding, may proceed to do complete justice between the parties.

(4) In the view we have taken of this case, it is unnecessary to consider whether the manifestly illegal stipulations in this contract had the effect of vitiating the entire agreement. It bears evidence upon its face of having been extorted from the necessities of the railway company, and contains many provisions which fail to commend it to the consideration of a court of equity.

There is no practical distinction between these two appeals. By his order of appointment, the receiver was authorized to take possession of the money and assets and all other rights and property of the railway company, wherever the same might be found, including its equitable interests, things in action, and other effects; and he is as much entitled to recover moneys due upon contracts made with the railway company as with himself. No question arises with regard to the rights of other creditors, as was the case in *Galveston Railroad* v. *Cowdrey*, 11 Wall. 459; *American Bridge Co.* v. *Heidelbach*, 94 U. S. 798; and *Gilman* v. *Telegraph Co.*, 91 U. S. 603; and as between the railway company and the receiver the latter was entitled to the money, subject to any valid set-off of the oil company.

There was no error in the disposition of either of these two cases by the court below, and both decrees are, therefore,

*Affirmed.*

MR. JUSTICE LAMAR was not present at the argument and took no part in the decision of this case.