**RESOLUTION TRUST CORPORATION,**
**as Receiver for Midwest Savings**
**Association, F.A., Appellant,**

v.

**CEDARMINN    BUILDING    LIMITED**
**PARTNERSHIP, a Minnesota limited**
**partnership; Cedar Minn Realty Corp.,**
**its general partner; Minncedar Land**
**Limited Partnership; Midunited Build-**
**ing Company Limited Partnership,**
**a    Minnesota    limited    partnership;**
**Midrock Land Corp., its general part-**
**ner; RockMinn Leasing Corp., Cedar-**
**Minn Building Limited Partnership, a**
**Minnesota limited partnership; Chemi-**
**cal Bank;    Norstar Bank;    Federal**
**Home Loan Bank of Des Moines, Ap-**
**pellees.**

**CEDARMINN    BUILDING    LIMITED**
**PARTNERSHIP, a Minnesota limited**
**partnership; MinnCedar Land Limited,**
**a    Minnesota    limited    partnership;**
**Midunited Building Limited Partner-**
**ship, a Minnesota limited partnership;**
**RockMinn Leasing Corp., a Minnesota**
**corporation, Appellees,**

v.

**RESOLUTION TRUST CORPORATION,**
**a government corporation, and in its**
**capacity as Receiver of Midwest Feder-**
**al Savings and Loan Association of**
**Minneapolis and as Conservator and**
**Receiver for Midwest Savings Associa-**
**tion, F.A., Appellant.**

**Midwest Federal Savings and Loan Asso-**
**ciation of Minneapolis, in Receivership;**
**Midwest Savings Association, F.A., in**
**Receivership and Conservatorship.**

**RESOLUTION TRUST CORPORATION,**
**as Receiver for Midwest Savings Asso-**
**ciation, F.A., Plaintiff–Appellee,**

v.

**CEDARMINN    BUILDING    LIMITED**
**PARTNERSHIP, a Minnesota limited**
**partnership; Cedar Minn Realty Corp.,**
**its general partner; MinnCedar Land**
**Limited; Midunited Building Company**
**Limited Partnership, a Minnesota lim-**
**ited partnership; Midrock Land Corp.,**
**its general partner; RockMinn Leasing**
**Corp.;   CedarMinn Building Limited**
**Partnership, a Minnesota limited part-**
**nership, Defendants–Appellants.**

**Chemical Bank;  Norstar Bank;  Federal**
**Home Loan Bank of Des Moines,**
**Defendants.**

**CEDARMINN    BUILDING    LIMITED**
**PARTNERSHIP, a Minnesota limited**
**partnership; MinnCedar Land Limited,**
**a    Minnesota    limited    partnership;**
**Midunited Building Limited Partner-**
**ship, a Minnesota limited partnership;**
**RockMinn Leasing Corp., a Minnesota**
**corporation, Defendants–Appellants,**

v.

**RESOLUTION TRUST CORPORATION,**
**a government corporation, and in its**
**capacity as Receiver of Midwest Feder-**
**al Savings and Loan Association of**

Minneapolis and as Conservator and Receiver for Midwest Savings Association, F.A.; Midwest Federal Savings and Loan Association of Minneapolis, in Receivership; Midwest Savings Association, F.A., in Receivership and Conservatorship, Defendants–Appellees.

RESOLUTION TRUST CORPORATION, as Receiver for Midwest Savings Association, F.A., Plaintiff–Appellee,

v.

CEDARMINN BUILDING LIMITED PARTNERSHIP, a Minnesota limited partnership; Cedar Minn Realty Corp., its general partner; MinnCedar Land Limited; Midunited Building Company Limited Partnership, a Minnesota limited partnership; Midrock Land Corp., its general partner; RockMinn Leasing Corp., CedarMinn Building Limited Partnership, a Minnesota limited partnership, Defendants–Appellants.

Chemical Bank; Norstar Bank; Federal Home Loan Bank of Des Moines, Defendants. (Two Cases)

CEDARMINN BUILDING LIMITED PARTNERSHIP, a Minnesota limited partnership; MinnCedar Land Limited, a Minnesota limited partnership; Midunited Building Limited Partnership, a Minnesota limited partnership; RockMinn Leasing Corp., a Minnesota corporation, Plaintiffs–Appellants,

v.

RESOLUTION TRUST CORPORATION, a government corporation, and in its capacity as Receiver of Midwest Federal Savings and Loan Association of Minneapolis and as Conservator and Receiver for Midwest Savings Association, F.A.; Midwest Federal Savings and Loan Association of Minneapolis, in Receivership; Midwest Savings Association, F.A., in Receivership and Conservatorship, Defendants–Appellees.

CEDARMINN BUILDING LIMITED PARTNERSHIP, a Minnesota limited partnership; MinnCedar Land Limited, a Minnesota limited partnership; Midunited Building Limited Partnership, a Minnesota Limited partnership; RockMinn Leasing Corp., a Minnesota corporation, Plaintiffs–Appellants,

v.

RESOLUTION TRUST CORPORATION, a government corporation, and in its capacity as Receiver of Midwest Federal Savings and Loan Association of Minneapolis and as Conservator and Receiver for Midwest Savings Association, F.A., Defendant–Appellee.

Nos. 91–1902, 91–1972, 91–2287 and 91–2546.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 13, 1991.

Decided Feb. 18, 1992.

Rehearing and Rehearing En Banc Denied March 27, 1992.

Dorothy L. Nichols, Washington, D.C., argued (Richard T. Aboussie, Colleen B. Bombardier, Richard J. Osterman, Jr., Jose P. Ceppi, Lawrence H. Richmond and Terrill A. Rupp, on the brief), for Resolution Trust Corp.

Roger B. Kaplan, Woodbridge, N.J., argued (Laura V. Studwell, Woodbridge, N.J. and Robert R. Weinstine, Steven C. Tourek and David A. Kristal, St. Paul, Minn., on the brief), for CedarMinn Bldg. Ltd. Partnership, et al.

Before FAGG, Circuit Judge, TIMBERS,* Senior Circuit Judge, and MAGILL, Circuit Judge.

MAGILL, Circuit Judge.

The Resolution Trust Corporation (RTC) appeals the district court's determination that the repudiation of certain leases by RTC as the receiver for a failed savings and loan was untimely. We find this result in error and, therefore, reverse.

I.

Midwest Federal Savings & Loan Association was mired in financial straits. Conjuring up a short-term solution to keep federal regulators at bay, Midwest Federal contracted with a group of investment partnerships to sell and lease back nineteen branch offices of the thrift. Under the two sale-leaseback agreements reached in 1985 and 1986, Midwest Federal sold nineteen branch offices to the partnerships (hereinafter collectively referred to as CedarMinn) at inflated prices. CedarMinn, in turn, agreed to lease the branches back to Midwest Federal at inflated rents. This agreement enabled Midwest Federal to show sig-

* THE HONORABLE WILLIAM H. TIMBERS, Senior United States Circuit Judge for the Second Circuit, sitting by designation.

nificant income during the years the sales were recognized.

Midwest Federal wholly financed the purchase by CedarMinn through a non-recourse loan to the partnerships. Midwest Federal structured its lease payments to service the debt. Midwest Federal issued two letters of credit totalling $11.8 million to ensure payment. The agreements' entire risk, therefore, devolved upon Midwest Federal.[1] The district court found that the contractual rents under the agreements were more than five times the market rate. *RTC v. CedarMinn Bldg. Ltd. Partnership*, No. 4–90–828, slip op. at 24 (D.Minn. May 22, 1991).

The Federal Home Loan Bank Board on February 13, 1989, declared Midwest Federal insolvent and appointed the Federal Savings and Loan Insurance Corporation (FSLIC) as conservator. On May 4, 1989, FSLIC transferred the assets and liabilities of Midwest Federal to a new entity, Midwest Savings Association. FSLIC was appointed receiver of Midwest Federal and conservator of Midwest Savings.

Congress passed the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) in August of 1989. Under FIRREA, RTC statutorily succeeded FSLIC as conservator of Midwest Savings. After negotiations aimed at selling Midwest Savings in its entirety failed, the conservator sold Midwest Savings' deposits to other institutions in October of 1990. On October 5, 1990, RTC was appointed receiver of Midwest Savings. Shortly thereafter, on October 29, 1990, RTC repudiated the CedarMinn leases.

RTC brought an action in district court seeking a declaratory judgment that its repudiation was timely. CedarMinn sued for damages and the right to draw on the letters of credit.

The district court held: (1) RTC's repudiation of the leases was invalid because it was not made within a reasonable period after RTC's appointment as conservator or receiver; and (2) CedarMinn was enjoined from drawing on the letters of credit so long as RTC continued to make timely rental payments because RTC's attempted repudiation did not constitute a default. Both sides appeal.[2]

## II.

RTC repudiated the leases under 12 U.S.C.A. § 1821(e)(1) (West 1989),[3] which provides that the conservator or receiver for any insured depository institution may disaffirm or repudiate any burdensome contract or lease. In so doing, the conservator or receiver must make the repudiation determination within a reasonable period after its appointment. 12 U.S.C.A. § 1821(e)(2). The liability for a conservator or receiver which timely repudiates a lease in which it was the lessee is limited to the contractual rent accrued through the date of disaffirmance. 12 U.S.C.A. § 1821(e)(4)(B)(i).[4] The lessor loses any claim under an acceleration clause or penalty provision of the lease. 12 U.S.C.A. § 1821(e)(4)(B)(ii).

CedarMinn argues that the "reasonable period" for repudiation commences when RTC is first appointed as a conservator or receiver. CedarMinn contends the October 1990 repudiation, which came fourteen

---

**1.** The sale-leaseback transactions were initiated by Midwest Federal. CedarMinn and its principals had no prior connection to Midwest Federal.

**2.** Subsequent to the filing of this appeal, CedarMinn drew on the letters of credit, claiming a separate default by RTC. Upon motion by RTC, the district court modified its initial order, holding: (1) CedarMinn was enjoined from dispersing the proceeds of the letters of credit, *RTC v. CedarMinn*, No. 4–90–828, slip op. at 32 (D.Minn. May 22, 1991); (2) the RTC's offsetting of its rental payments to compensate for the rental payments paid to CedarMinn from sec-

ondary leases was a "technical" default under the contract, *id.* at 19; but (3) despite the "technical" default, CedarMinn was not entitled to liquidated damages because the contract's liquidated damages clause was unenforceable as a penalty provision, *id.* at 26.

**3.** Unless noted otherwise, all statutory citations are to U.S.C.A. (1989).

**4.** The October 29, 1990, repudiation was to be effective February 28, 1991. Therefore, the contractual rent would accrue through February 28, 1991. 12 U.S.C.A. § 1821(d)(4)(B)(i)(II).

months after RTC's initial appointment under FIRREA, therefore, was untimely. RTC asserts that the statute gives both the conservator and receiver an independent right to repudiation and a separate "reasonable period" in which to make the repudiation decision. The period during which it could repudiate the leases, therefore, renewed itself when RTC was appointed receiver of Midwest Savings in October 1990. The district court declared the repudiation ineffective, ruling that RTC was required to make the repudiation determination within a reasonable period of its first appointment as conservator or receiver. *RTC v. CedarMinn Bldg. Ltd. Partnership*, No. 4–90–828, slip op. at 19–20 (D.Minn. Mar. 4, 1991).

### A. Independent Repudiation Rights

■ The plain language of FIRREA grants independent rights of repudiation to RTC in both its capacity as conservator and receiver of an institution. Therefore, even though RTC may succeed itself in the capacity of conservator or receiver of the same institution, it retains the right to repudiate leases, regardless of whether it accepted the leases in its prior capacity.

The statute at issue reads in its entirety:

(1) Authority to repudiate contracts

In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease—

   (A) to which such institution is a party;

   (B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and

   (C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.

(2) Timing of repudiation

The conservator or receiver appointed for any insured depository institution in accordance with subsection (c) of this section shall determine whether or not to exercise the rights of repudiation under this subsection within a reasonable period following such appointment.

12 U.S.C.A. § 1821(e).

In these two short subsections, Congress repeats the dual treatment of "conservator or receiver" seven times. Nowhere in the language of the statute is it stated or implied that the appointment of RTC as a conservator negates powers RTC would enjoy if it were later appointed a receiver of the same institution. Had Congress intended RTC's status as a conservator or a receiver to be mere artifice, it would have granted all duties, rights, and powers to the Corporation.[5]

### B. Independent Repudiation Time Frame

■ Even though we find that the plain language of the statute confers an independent right of repudiation upon both the conservator and receiver of a failed, government-insured thrift, our inquiry is not over. We must next determine whether Congress' insistence that the decision to repudiate be made within a reasonable period constitutes an implicit restriction on the receiver's right to repudiate in situations where the receiver follows a conservator. In other words, does Congress' mandate to make the repudiation determination within a reasonable period contemplate only a single time frame? Or is the decision by RTC not to repudiate the leases in its position as conservator irrelevant to RTC's determination in its capacity as receiver?

The standard we employ to review an agency's interpretation of a statute it administers is clear.

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether

---

**5.** Throughout this opinion, the term Corporation will refer to either the RTC or the FDIC. Congress gave the RTC all of the receivership and conservatorship powers it granted the FDIC. 12 U.S.C.A. § 1441a(b)(4) (West Supp. 1991). Therefore, the use of the term Corporation will refer to either agency exercising these parallel powers.

Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

FIRREA requires the "conservator or receiver" to determine whether or not to repudiate a contract "within a reasonable period following such appointment." 12 U.S.C.A. § 1821(e)(2). We find the statute subject to conflicting readings. RTC argues that Congress intended to provide independent repudiation rights to both the conservator and receiver. Since there is no indication that Congress intended to restrict the receiver's power to repudiate in situations where it follows a conservator, RTC asserts that Congress meant to give RTC a fresh chance to repudiate contracts when it is reappointed as a receiver. Ce-

darMinn makes a plausible argument that the "reasonable period" requirement begins to run upon the appointment of RTC as either "conservator or receiver" and, therefore, contemplates a single time frame.

Since we find the statute less clear on this point, we must accede to a permissible interpretation of the statute by RTC.[6] *Chevron U.S.A.*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82. RTC has formally interpreted § 1821(e) as granting independent rights on it as both conservator and receiver to repudiate contracts. Moreover, RTC interprets FIRREA as granting it this repudiation power as a receiver even in situations in which it had earlier failed to repudiate as conservator.[7] For the following reasons, we find reasonable RTC's interpretation that Congress intended both the conservator and the receiver to have an independent "reasonable period" in which to repudiate.

First, while the specific language of the statute is less than crystalline, the design and language of the statute as a whole, *see K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988), reveal the congressional intent to create independent powers of repudiation, regardless of any activity taken by RTC in a prior capacity. Throughout FIRREA, Congress specifically articulated when the Corporation was to exercise a duty, right, or power in its capacity as a "conservator or receiver."[8] In each in-

---

**6.** The RTC was established as an instrumentality of the United States to carry on a program to manage all cases of failed thrifts. H.R.Rep. No. 101–54(1), 101st Cong., 1st Sess. (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 152–53. The RTC is an agency of the United States when acting as a corporation and an agency of the United States to the same extent as the Federal Deposit Insurance Corporation when acting as a conservator or receiver. 12 U.S.C.A. § 1441a(b)(1)(B) (West Supp.1991).

**7.** Statement of Policy Regarding Treatment of Collateralized Letters of Credit After Appointment of the Resolution Trust Corporation as Conservator or Receiver, at 3 (Sept. 25, 1990); Statement of Policy Regarding the Payment of Interest on Direct Collateralized Obligations after Appointment of the Resolution Trust Corporation as Conservator or Receiver, at 3 (April

1990). The latter policy statement specifically provides that a receiver retains all powers of repudiation regardless of whether a prior conservator or receiver of the same institution honored those contracts.

**8.** 12 U.S.C.A. § 1821(c)(1) authorizes the Corporation to accept appointment as "conservator or receiver" for any insured depository institution; §§ 1821(c)(2)(C) and (c)(3)(C) stipulate that the Corporation shall not be subject to any other agency of the United States when it is acting as a "conservator or receiver;" § 1821(c)(3)(A) provides that the Corporation may accept appointment as a "conservator or receiver" of a state insured depository institution; § 1821(c)(3)(B) grants the Corporation the same powers as "conservator or receiver" when appointed by a state authority as when appointed by a federal authority; §§ 1821(c)(4) and (5)

stance, it is clear that Congress intended the duty, right, or power to be enjoyed or exercised by both the conservator and the receiver. It stretches credibility to assume Congress intended any of these rights to be forfeited in instances when the Corporation preceded itself as conservator or receiver of an institution. More instructive, however, is the care Congress took to delineate those duties, rights, and powers the Corporation could pursue only in its capacity as receiver, or only in its capacity as conservator, but not both.[9]

Second, the traditional tools of statutory construction likewise elicit a clear congressional directive to grant RTC an independent right of repudiation in both its capacity as conservator and receiver. The accepted canon of statutory construction is to treat the disjunctive "or" as giving independent meaning to the words it separates, unless the context of the statute requires otherwise. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979); *United States v. Smeathers*, 884 F.2d 363, 364 (8th Cir.1989) (per curiam); *United States v. Lane*, 464 F.2d 593, 595 (8th Cir.), *cert. denied*, 409 U.S. 876, 93 S.Ct. 127, 34 L.Ed.2d 129 (1972).

'The word "or" in the statute is not a fertile word which is subject to varied constructions.' *United States v. Newman*, 405 F.2d 189, 197 (5th Cir.1968).

articulate the grounds under which the Corporation may appoint itself as sole "conservator or receiver" of an institution; § 1821(c)(7) establishes the judicial review available to an institution challenging the Corporation's appointment of itself as "conservator or receiver;" § 1821(d)(2)(A) stipulates that the Corporation in its capacity as "conservator or receiver" shall accede to the rights of the institution's prior management; §§ 1821(d)(2)(B) and (C) authorize the Corporation as "conservator or receiver" to operate the institution; § 1821(d)(2)(G) authorizes the Corporation as "conservator or receiver" to merge the institution with another insured institution or transfer assets of the institution; § 1821(d)(2)(H) authorizes the Corporation as "conservator or receiver" to pay valid obligations of the institution; § 1821(d)(2)(I) (West Supp.1991) grants subpoena powers to the Corporation as "conservator or receiver" of an institution; § 1821(d)(2)(J) (West Supp.1991) grants incidental powers to the Corporation as "conservator or receiver;" §§ 1821(d)(13)(A) and (B) delineate the Corporation's duties and rights as "conservator or receiver" pertaining to final unappealable judgments; § 1821(d)(14) establishes the statute of limitations for claims brought by the Corporation as "conservator or receiver;" §§ 1821(d)(15)(A)–(C) delineate the accounting and record keeping requirements of the Corporation as "conservator or receiver;" § 1821(d)(17) (West Supp.1991) authorizes the Corporation as "conservator or receiver" to avoid fraudulent transfers; § 1821(d)(18) enables the Corporation as "conservator or receiver" to request a court to attach assets; § 1821(e)(1) authorizes the Corporation as "conservator or receiver" to repudiate contracts; § 1821(e)(2) restricts the time under which the Corporation as "conservator or receiver" may elect to repudiate contracts; §§ 1821(e)(3)–(7) set out the rights of the parties after the Corporation as "conservator or receiver" has repudiated a contract or lease; §§ 1821(e)(9)–(10) delineate procedures for the Corporation as "conservator or receiver" to transfer certain financial contracts; § 1821(e)(12) authorizes the Corporation as "conservator or receiver" to enforce contracts entered into by the institution; and § 1821(k) authorizes the Corporation as "conservator or receiver" to bring suit against former officials of the institution.

9. Sections 1821(c)(2)(A) and 1821(c)(6) articulate the different criteria under which the Corporation "may" be appointed conservator and "shall" be appointed receiver; §§ 1821(c)(2)(D) and 1821(c)(3)(D) mandate that any institution to which the Corporation is appointed conservator shall remain under the supervision of the federal banking agency or the state banking supervisory authority; § 1821(c)(8) enables the Corporation, when it has appointed itself conservator of a state institution, to appoint itself receiver of that institution; § 1821(c)(9)(B) grants the Corporation as receiver of a state institution the additional power to liquidate the institution; §§ 1821(d)(2)(D) and (E) articulate the separate powers of the Corporation in its capacity as conservator and in its capacity as receiver; § 1821(d)(2)(F) grants the Corporation in its capacity as receiver the power to create a new institution to take over the assets and liabilities of the former institution, or to create a new national bank or bridge bank; §§ 1821(d)(3)–(11) establish the procedures to be used by the Corporation as receiver to handle claims against the institution; § 1821(d)(12) articulates different powers to stay legal proceedings enjoyed by the Corporation as receiver and as conservator; § 1821(d)(13)(D) limits the judicial review of actions taken by the Corporation in its capacity as receiver; § 1821(d)(15)(D) enables the Corporation in its capacity as receiver to destroy records of an institution under certain conditions; and § 1821(e)(8) (West Supp. 1991) establishes rights of parties upon the termination of certain qualified financial products by the Corporation in its capacity as receiver.

When 'or' is inserted between two clauses, the clauses are treated disjunctively rather than conjunctively.

*U.S. Customs Serv. v. Federal Labor Relations Auth.,* 739 F.2d 829, 832 (2d Cir. 1984). In *Ballentine v. De Sylva,* 226 F.2d 623, 625 (9th Cir.1955), *aff'd,* 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1956), a statute provided that the "widow ... or children" of a deceased author of a copyrighted work may apply for an extension of the copyright. The court held that the disjunctive application of the word "or" granted both the widow and the children the right to apply for the extension. *Id.* at 627. Moreover, the action by one of the enumerated persons did not cut off the rights of the other merely because one person acted first. *Id.*

Third, the statutory history of FIRREA reveals nothing that indicates Congress intended something other than giving the right of repudiation to both the conservator and the receiver. The House Report tracks the language of the statute, giving the repudiation power to the conservator or receiver. H.R.Rep. No. 101–54(1), 101st Cong., 1st Sess. (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 127. Moreover, the statute and its legislative history emphasize that the powers granted RTC under FIRREA parallel the powers granted conservators or receivers under the former law. *Id.* at 126; 12 U.S.C.A. § 1441a(b)(4) (West Supp.1991); S.Rep. No. 101–19, 101st Cong., 1st Sess. 31 (1989).

It has been recognized for at least a century that receivers may repudiate contracts and leases. *Sunflower Oil Co. v. Wilson,* 142 U.S. 313, 322, 12 S.Ct. 235, 237, 35 L.Ed. 1025 (1892); *First Nat'l Bank of Chicago v. First Nat'l Bank of Wheaton,* 78 F.2d 502, 502–03 (7th Cir.), *cert. denied,* 296 U.S. 651, 56 S.Ct. 368, 80 L.Ed. 463 (1935); *Kennedy v. Boston–Continental Nat'l Bank,* 84 F.2d 592, 597 (1st Cir.1936), *cert. dismissed,* 300 U.S. 684, 57 S.Ct. 667, 81 L.Ed. 887 (1937); *see* R. Clark, 2 *A Treatise on The Law and Practice of Receivers,* § 442 at 733–34 (3d ed. 1959). This power continued to be exercised by the FDIC and FSLIC in the years preceding FIRREA. 12 C.F.R. § 549.3(a) (1988);

*Argonaut Sav. & Loan Ass'n v. FDIC,* 392 F.2d 195, 197 (9th Cir.), *cert. denied,* 393 U.S. 839, 89 S.Ct. 116, 21 L.Ed.2d 110 (1968); *FDIC v. Grella,* 553 F.2d 258, 262 (2d Cir.1977). Conservators of government-insured savings institutions and banks also held this power of repudiation. 12 C.F.R. § 548.2(k) (1988) ("The conservator ... may ... (k) ... repudiate any lease or contract he considers burdensome"); *Dinan v. First Nat'l Bank of Detroit,* 117 F.2d 459, 460 (6th Cir.1941), *cert. dismissed,* 315 U.S. 824, 62 S.Ct. 622, 86 L.Ed. 1220 (1942); *Buhl Land Co. v. Kavanagh,* 131 F.Supp. 136, 138 (E.D.Mich.1954). Since Congress intended RTC to exercise rights formerly held by the FDIC and FSLIC, there can be no doubt that Congress intended RTC to retain the independent rights granted to conservators and receivers to repudiate leases.

Fourth, the importance of retaining an independent right to repudiate contracts is exemplified by the distinct missions of the conservator and receiver. That Congress intended conservators and receivers to have different missions is clear. RTC as conservator of a failed institution was empowered to take action necessary to restore the failed thrift to a solvent position and "to carry on the business of the institution and preserve and conserve the assets and property of the institution." 12 U.S.C.A. § 1821(d)(2)(D). As receiver, on the other hand, RTC was empowered to liquidate the institution. 12 U.S.C.A. § 1821(d)(2)(E).

CedarMinn, relying on *RTC v. United Trust Fund,* 775 F.Supp. 1465, 1468 (S.D.Fla.1991), argues that the distinction in duties between conservators and receivers is more theoretical than real. "[T]he RTC frequently appoints conservators, receivers, new conservators, and new receivers in case of thrift difficulties," and the changing back and forth from one legal entity to another frequently amounts to no more than blanket signing of papers and mere legal formalities. *Id.*

It is difficult to argue that the concern that RTC could prolong indefinitely the repudiation decision is misplaced. Neverthe-

less, we refuse to adopt such a cavalier attitude about the distinction in roles between the conservator and receiver.

At least as early as the 1930s, it was recognized that the purpose of a conservator was to maintain the institution as an ongoing concern. *Bryce v. National City Bank of New Rochelle*, 17 F.Supp. 792, 799 (S.D.N.Y.), *aff'd*, 93 F.2d 300 (2d Cir.1937). The Home Owners' Loan Act of 1933, 12 U.S.C. § 1464(d)(6)(D) (1988) (amended 1989), specifically provided that a conservator of a federal savings and loan was to "operate the association in its own name or to conserve its assets." Receivers, on the other hand, have been empowered to liquidate the institution. *FDIC v. Grella*, 553 F.2d 258, 261 (2d Cir.1977).

This distinction was not only specifically recognized in FIRREA, it was emphasized in the Conference Report.

> The title ... distinguishes between the powers of a conservator and receiver, making clear that a conservator operates or disposes of an institution as a going concern while a receiver has the power to liquidate and wind up the affairs of an institution.

H.R.Conf.Rep. No. 101–209, 101st Cong., 1st Sess. 398 (1989).

This distinction in the roles between conservator and receiver is not only recognized historically, but is practical as well, particularly as it pertains to the repudiation strategy of a conservator and receiver. The conservator's mission is to conduct an institution as an ongoing business. In that light, the strategic decision whether or not to repudiate a lease—particularly when the institution is operating a consumer enterprise from the leased premises—stands apart from the strategy of a receiver, whose interest, by definition, is shutting the business down. A conservator needs an open door; a receiver does not. Therefore, the value of a specific lease could vary significantly depending on the mission of the occupying party at the particular time. The requirement that RTC make the repudiation decision once and for all shortly after its first appointment as conservator would put RTC in the untenable position of trying to operate the business as an ongoing concern with one hand, while at the same time calculating the lease repudiation issue as if it were shutting the business down.

This distinction is illustrated by *Monument Square Assocs., Inc. v. RTC*, No. 90–12060–T, 1991 WL 280020 (D.Mass. Dec. 13, 1991). In *Monument Square*, RTC was appointed conservator of Home Owners Savings Bank. RTC was burdened with two leases, only one of which covered property actually being used by the Corporation. Therefore, RTC repudiated the lease on the non-occupied property within a month of its appointment as conservator. *Id.* at 2. The lease on the property being used by the institution, however, was not repudiated until nearly six months later, after the institution was placed in receivership. *Id.* This case articulates the need for RTC to retain independent rights of repudiation in its two capacities. Obviously, RTC as conservator would choose to repudiate a lease on property it is not using, but might hesitate to repudiate the lease on property from which it is conducting a business. On the other hand, once the institution is placed into receivership, RTC might elect to repudiate the lease on the property it formerly used to conduct its business. Relying on this dichotomy of purpose and the plain language of the statute, the *Monument Square* court determined that RTC retained a separate right to repudiate even though it followed itself as conservator and even though it elected as conservator not to repudiate the contract.[10] *Id.* at 7.

Fifth, Congress' grant of the repudiation right to the conservator or receiver must also be viewed in light of the fact that it has long been recognized that conservators

---

10. We need not decide whether the Corporation retains the repudiation right as a receiver when it immediately preceded itself as receiver of the same institution. *See 701 NPB Assocs. v. FDIC*, 779 F.Supp. 1336–1339 (S.D.Fla.1991) (holding that the "reasonable period" for the Corporation to make a repudiation decision dated from its initial appointment as receiver of a failed thrift, even though the agency appointed itself receiver six months later).

of failed institutions are often replaced by receivers. *Dinan v. First Nat'l Bank of Detroit,* 117 F.2d 459, 460 (6th Cir.1941), *cert. dismissed,* 315 U.S. 824, 62 S.Ct. 622, 86 L.Ed. 1220 (1942); *Buhl Land Co. v. Kavanagh,* 131 F.Supp. 136, 138 (E.D.Mich. 1954). Prior to the passage of FIRREA, Congress recognized that conservators appointed for failed institutions may be succeeded by receivers. 12 U.S.C. § 1464(d)(6)(D) (1988) (amended 1989); *Lincoln Sav. & Loan Ass'n v. Wall,* 743 F.Supp. 901, 902–03 (D.D.C.1990). FIRREA specifically retained this power. 12 U.S.C.A. § 1464(d)(2)(F) (West Supp.1991).

Finally, it must be recognized that Congress granted broad power to the Corporation[11] and directed that conservators and receivers should not shy away from wielding this power. Congress specifically directed RTC to look closely at sale-leaseback transactions such as those at issue here.

> In detailing the repudiation power Title II provides for repudiation of real property leases. The disaffirmance of burdensome leases should take into account the total circumstances of the lease, including whether, in the case of a sale and lease back, the lease was executed as part of an arm's length transaction.

H.R.Conf.Rep. No. 101–209, 101st Cong., 1st Sess. 399 (1989). CedarMinn stresses that the leases were negotiated at arm's length. What CedarMinn fails to recognize is that Midwest's arms were tied behind its back by its financial crisis. The luxuriant terms of these contracts should have made this evident to CedarMinn. In fact, counsel for CedarMinn admitted to the court that no sophisticated business person would accept these leases.[12]

For all of these reasons, we find RTC's interpretation of the statute permissible. Moreover, our analysis shows that the congressional intent is so apparent that RTC's interpretation is the most reasonable interpretation.

### C. "Reasonable Period"

■ Since we find that RTC retained a new power to repudiate leases when it was appointed receiver in October 1990, we need only briefly address the reasonable period limitation of 12 U.S.C.A. § 1821(e)(2). FIRREA does not define reasonableness. Congress specifically intended to give RTC flexibility in determining what constitutes a reasonable period for repudiation.[13] The amount of time that is reasonable must be determined according to the circumstances of each case. *Union Bank v. Federal Sav. & Loan Ins. Corp.,* 724 F.Supp. 468, 471 (E.D.Ky.1989). No one could quarrel seriously with the fact that RTC's repudiation within twenty-four days of its appointment as receiver was reasonable. We need not decide whether the fourteen-month delay between RTC's appointment as conservator and its subsequent repudiation as receiver was unreasonable. We need only point out that since CedarMinn could show no prejudice by RTC's continued attempts to renegotiate the leases prior to the placement of Mid-

---

**11.** The grant of this extraordinary power to repudiate contracts is given "[i]n addition to any other rights a conservator or receiver may have." 12 U.S.C.A. § 1821(e)(1).

**12.** Reminding the court that RTC had been unable to sell Midwest Federal as a whole, partially because no one wanted to assume the leases, CedarMinn's counsel said, "Are we to believe today ... that these people represented by the likes of Briggs & Morgan, and Best & Flanagan, the Carl Pohlads of this community, essentially have agreed to honor a $4.2 million obligation per year of rentals? ... Of course they didn't." *RTC v. CedarMinn,* No. 4–90–828, slip op. at 25 (D.Minn. May 22, 1991).

**13.** Both the President's bill and the House bill initially set the repudiation period at 90 days. H.R.Rep. No. 101–54(1), 101st Cong., 1st Sess. (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 331; 1 G. Pulles, R. Whitlock and J. Hogg, *FIRREA, A Legislative History and Section–By–Section Analysis,* at 189–90 (1990). In conformity with the Senate bill, the final statute eliminated the express 90–day restriction, apparently concluding that RTC ought to be given some flexibility.

FIRREA's grant of a "reasonable period" within which to repudiate contracts follows the common law approach. *Sunflower Oil Co. v. Wilson,* 142 U.S. 313, 322, 12 S.Ct. 235, 237, 35 L.Ed. 1025 (1892); *FDIC v. Grella,* 553 F.2d 258, 262 (2d Cir.1977); *Buhl Land Co. v. Kavanagh,* 131 F.Supp. 136, 143 (E.D.Mich.1954).

west Savings in receivership,[14] RTC's repudiation could have been reasonable regardless of whether it had been appointed receiver of the institution and given an independent opportunity to repudiate the leases.

### III.

Congress passed FIRREA as emergency legislation to resolve expeditiously the "monumental problems involved with the unprecedented costs" of the savings and loan crisis.[15] H.R.Rep. No. 101–54(1), 101st Cong., 1st Sess. (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 104. Among the powers granted by Congress to RTC is the extraordinary right to repudiate contracts and leases RTC deems burdensome. That Congress intended this powerful tool to be exercised independently by conservators and receivers is clearly a permissible construction of the statute. We therefore find that RTC retained an independent right to repudiate the leases with CedarMinn within a reasonable period of its appointment as receiver. Since the repudiation occurred within twenty-four days of its appointment, FIRREA has been fully complied with. CedarMinn's damages are limited to those prescribed under 12 U.S.C.A. § 1821(e)(4). The judgment below is reversed.

---

**14.** Upon appointment as conservator, individuals responsible for the management of Midwest Savings determined at least as early as May 22, 1989, that the leases produced "significant detrimental effects" to the association's finances. *RTC v. CedarMinn*, No. 4–90–828, slip op. at 4–5 (D.Minn. Mar. 4, 1991). The RTC dutifully informed CedarMinn in December 1989 that it was considering repudiation of the leases. *Id.* at 5–6. Evidence also showed that RTC pursued negotiations with CedarMinn to renegotiate the leases to enable Midwest Savings to continue to operate from the offices. *Id.* at 7. CedarMinn clearly was not prejudiced by the ongoing negotiations. There were no businesses eager to take on these leases. CedarMinn itself admitted the leases were utterly unassumable by anyone.

Yet, despite the outrageous terms of these leases, CedarMinn continued to receive full rent.

**15.** The Senate Report noted that 500 thrifts failed between 1980 and 1988—three and one-half times the number of thrift failures in the prior 45 years combined. At the time of the report, the FSLIC had spent an estimated $78 billion in the 1980s alone, making the federal deposit insurer insolvent and illiquid. The General Accounting Office estimated that at least 338 thrifts, or more than 10% of all thrifts, were insolvent as of December 31, 1988, even though the FSLIC had liquidated or merged more than 200 insolvent thrifts during 1988. S.Rep. No. 101–19, 101st Cong., 1st Sess. 2 (1989).