18 F.3d 111
 62 USLW 2566
 RESOLUTION TRUST CORPORATION, as Receiver for Nassau Savings
and Loan Association, F.A., Plaintiff-Appellant,
v.
Selma DIAMOND, Ira Kaufman, Jerome Lederer, Peggy Lehman,
Susan Solomon Patullo, Lloyd Ribner, as executor of the
estate of Muriel Ribner, Horace Solomon, Lillian Solomon,
Denise Tucker, Angelo Aponte, Commissioner of the Division
of Housing and Community Renewal of the State of New York,
and Robert Abrams, Attorney General of the State of New
York, Defendants-Appellees,
and
New York State Division of Housing and Community Renewal, Appellee.
 No. 55, Docket 92-6244.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 20, 1993.
Decided March 2, 1994.
 
 Dennis S. Klein, Washington, DC (Abraham D. Sofaer, Lawrence F. Bates, Kevin M. Crotty, Hughes, Hubbard & Reed, Washington, DC, Frank H. Penski, New York, NY, Nixon, Hargrave, Devans & Doyle, New York, NY, of counsel), for plaintiff-appellant.
 Gary R. Connor, New York (Attorney General's Office, State of New York, New York, NY, Robert A. Machleder, New York, NY, Wien, Malkin & Bettex, New York, NY, Don D. Buchwald, New York, NY, Buchwald & Kaufman, New York, NY, of counsel), for defendants-appellees.
 Steven Raison, New York, NY (Colleen F. McGuire, New York, NY, on the brief), for defendant-appellee Lloyd Ribner.
 Before PRATT, McLAUGHLIN and JACOBS, Circuit Judges.
 JACOBS, Circuit Judge:
 
 
 1
 Resolution Trust Corporation ("RTC") is a government corporation that acts as receiver or conservator for federally-insured thrift institutions in financial distress. The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), directs RTC to realize a maximum recovery on the value of the thrift assets that come into its possession, and has conferred on RTC a number of extraordinary powers to help it in doing so. Among the powers granted to RTC by Congress is the power to disaffirm or repudiate the contracts or leases which it finds to be burdensome. RTC came into possession of nine occupied condominium apartments located at 444 East 57th Street in New York City, and has sought to disaffirm or repudiate the nine tenancies, each of which is subject to local and state rent regulation. The United States District Court for the Southern District of New York (Carter, J.) granted summary judgment to the tenants and New York State and denied summary judgment to RTC on the ground that the tenancies in question, by virtue of the rent regulation laws, are "statutory" tenancies rather than leases or contracts subject to disaffirmation or repudiation by RTC 801 F.Supp. 1152. We hold that these tenancies are founded upon contract and lease obligations subject to the disaffirmation and repudiation power of RTC, and we therefore reverse.
 
 BACKGROUND
 A. FIRREA and RTC
 
 2
 RTC was created by Congress in 1989 as part of a comprehensive legislative initiative to mitigate a financial crisis that had engulfed the thrift industry and the Federal Savings and Loan Insurance Corporation ("FSLIC"). H.R.Rep. No. 54(I), 101st Cong., 1st Sess. (1989), reprinted in 1989 U.S.C.C.A.N. 86, 98. The Government Accounting Office had estimated that FSLIC's operating deficit was $56 billion at the end of 1988. Id. at U.S.C.C.A.N. 100; see also S.Rep. No. 19, 101st Cong., 1st Sess. 2 (1989) ("Current estimates of the remaining cost to the Federal deposit insurance system of resolving the problem range from $50 billion to more than $150 billion....").
 
 
 3
 FIRREA, adopted on August 9, 1989, Pub.L. No. 101-73, 103 Stat. 364 (codified in scattered sections of 12 U.S.C.), "constitute[d] emergency legislation" to stop the financial hemorrhaging. S.Rep. No. 19 at 3. As the House Report put it: "The interests of the American taxpayer demand an expedited resolution to the monumental problems involved with the unprecedented costs of dealing with hundreds of insolvent thrifts and the orderly disposition of the assets of these failed institutions." H.R.Rep. No. 54(I) at U.S.C.C.A.N. 86, 104. RTC, a "wholly-owned government corporation," was created "to manage and dispose of the assets acquired from failed thrifts." Id.
 
 
 4
 RTC's primary purpose is to act as conservator or receiver for failed thrift institutions. 12 U.S.C. Sec. 1441a(b)(3)(A) (1989 & Supp.). Congress required that RTC conduct its operations "in a manner which [ ] maximizes the net present value return from the sale or other disposition of" thrift assets that come into its hands. 12 U.S.C. Sec. 1441a(b)(3)(C)(i); see also S.Rep. No. 19 at 352 (Congress intended that RTC "conduct its operations so as to maximize recovery on assets it acquires, make efficient use of funds it obtains ... and minimize losses incurred in resolving cases.").
 
 
 5
 To help RTC in carrying out this mandate, Congress armed it with the power to disaffirm or repudiate contracts or leases that RTC in its discretion determines to be burdensome. 12 U.S.C. Sec. 1821(e)(1) (made applicable to RTC by 12 U.S.C. Sec. 1441a(b)(4)(A)). The reach of that power is the primary issue on this appeal.B. Rent Regulations
 
 
 6
 Owners of residential rental property in New York City have been subject to some form of rent regulation for over fifty years. Originally imposed by the federal government during World War II (Emergency Price Control Act of 1942, Jan. 30, 1942, ch. 26, Title I, Sec. 1, 56 Stat. 23), rent controls were continued by state legislation in 1946 (Emergency Housing Rent Control Law, L.1946, c. 274 (codified at N.Y.Unconsol.Laws Secs. 8581-8597 (McKinney 1987))). Since 1962, the City of New York has enforced its own local rent regulations, which (like the federal and state measures) regulate rents and evictions in privately owned residential housing. Admin.Code of City of N.Y., Secs. 26-401-415 (reported following N.Y. Unconsol.Law Sec. 8617 (McKinney 1987)) ("N.Y.C.Admin.Code"). Authorized by the State Legislature, these City laws were enacted pursuant to a City Council finding
 
 
 7
 that a serious public emergency continues to exist in the housing of a considerable number of persons in the city, which emergency was created by [World War II], the effects of war and the aftermath of hostilities ... [and therefore] such action, as a temporary measure to be effective until ... such emergency no longer exists ... [requires the council to intervene] to prevent exactions of unjust, unreasonable and oppressive rents and rental agreements....
 
 
 8
 N.Y.C.Admin.Code Sec. 26-401. This finding of emergency was renewed most recently by L.1985, c. 907 (effective Sept. 1, 1986).
 
 
 9
 Currently, there are two systems of rent regulation in New York: rent control and rent stabilization. Some of the nine rent-regulated condominium units at issue are rent controlled; the others are rent stabilized.
 
 
 10
 The maximum rent for each rent-controlled property is set by an administrative board on a biennial basis. N.Y.C.Admin.Code Sec. 26-405a(4), N.Y.Comp.Codes R. & Regs. tit. 9, Sec. 2201.5(a) ("9 NYCRR Sec. ----"). Upon certain enumerated contingencies, such as an increase in operating expenses, a landlord may petition the rent control board for an extraordinary increase. N.Y.C.Admin.Code Sec. 26-405g, 9 NYCRR Sec. 2202. So long as the tenant continues to pay the regulated rent, the landlord may not institute eviction proceedings. N.Y.C.Admin.Code Sec. 26-408a. Rent control does not require or contemplate a current written and signed lease. In this way, the rent-controlled tenancy survives the lease-term of the original lease instrument (and any written renewals thereof), and becomes a so-called "statutory" tenancy. See, e.g., W.T. Associates v. Huston, 123 Misc.2d 24, 472 N.Y.S.2d 562, 564 (Sup.Ct.1984).
 
 
 11
 The second program--rent stabilization--was adopted in 1969 in response to a perceived failure of rent control to adequately relieve the wartime housing emergency. N.Y.C.Admin.Code Secs. 26-501-520 (McKinney 1987); see 8200 Realty Corp. v. Lindsay, 27 N.Y.2d 124, 313 N.Y.S.2d 733, 742, 261 N.E.2d 647, 653 (1970). Unlike rent control, rent stabilization does require and contemplate a current written lease-contract, 9 NYCRR Sec. 2522.5, and requires the landlord to offer a renewal lease to the tenant before the end of each lease term. N.Y.C.Admin.Code Sec. 26-511c(4), 9 NYCRR Sec. 2522.5(b)(1). In that way, the rent-stabilized tenant, like his rent-controlled neighbor, enjoys occupancy for so long as he wishes. The City's rent guidelines board regularly fixes the maximum rent increase for one-year and two-year leases, N.Y.C.Admin.Code Sec. 26-512, the allowable percentage increase being based in part on market conditions. N.Y.C.Admin.Code Sec. 26-510b, 9 NYCRR Secs. 2521-22. It was thought that by adopting a regulatory scheme more sensitive to market prices, and giving property owners (at that time) a choice between rent control and stabilization, new construction would flourish and the persistent housing emergency would abate. 8200 Realty Corp., 313 N.Y.S.2d at 742-43, 261 N.E.2d at 653-54. However, the wartime housing emergency has been found to continue to this day, leaving most rental properties in New York subject to what the state's Court of Appeals once characterized as "an impenetrable thicket, confusing not only to laymen but to lawyers." In Matter of 89 Christopher, Inc. v. Joy, 35 N.Y.2d 213, 360 N.Y.S.2d 612, 618, 318 N.E.2d 776, 780 (1974).
 
 C. Martin Act
 
 12
 Rent regulation is also implemented by certain provisions of New York's blue sky law, the Martin Act. N.Y.Gen.Bus.Law, Art. 23-A, Secs. 352-359-h (McKinney 1984). Essentially an antifraud securities statute, see Abrams v. Long Beach Oceanfront Associates Limited Partnership, 136 Misc.2d 137, 518 N.Y.S.2d 323, 325 (Sup.Ct.1987), the act regulates (inter alia ) the offer and sale of securities evidencing an ownership interest in residential real property that has undergone a conversion to condominium or cooperative ownership. When the owner of an apartment building proposes such a conversion, the Martin Act mandates the inclusion of certain disclosures in the various offering documents. Among other things, the offeror is required to disclose the conditions under which eviction proceedings may be instituted against non-purchasing tenants, and the extent to which state and local rent-regulations will continue to apply to such tenancies. N.Y.Gen.Bus.Law Sec. 352-eeee2(c).
 
 
 13
 In any conversion of a residential building to cooperative or condominium status, the offer or sale of the underlying securities is illegal unless the offering statement has been filed with the State Attorney General. N.Y.Gen.Bus.Law Sec. 352-e1(a). No offer is considered to have been officially filed without a letter from the State Attorney General to the offeror certifying that the offeror has complied with all relevant provisions of the Martin Act. N.Y.Gen.Bus.Law Sec. 352-e2. The Attorney General is directed to withhold the letter of certification until he finds that the offering materials comply with the Martin Act, including the disclosures concerning the treatment of non-purchasing tenants. N.Y.Gen.Bus.Law Sec. 352-eeee2.
 
 D. The Tenancies
 
 14
 The individual appellees in this case are tenants in a residential building at 444 East 57th Street in New York City. Appellee Lloyd Ribner claims status as a tenant, which RTC disputes--a collateral issue we address in a separate section of this opinion. Since we reverse the order dismissing RTC's complaint against Ribner, this opinion is fully applicable to him, except to the extent we indicate otherwise.
 
 
 15
 In 1983 the building underwent a conversion to condominium ownership, pursuant to a "non-eviction" plan under the Martin Act. N.Y.Gen.Bus.Law Sec. 352-eeee2(c). In accordance with the disclosure requirements of this statute, non-purchasing tenants, including the nine appellees in this case, were informed in the conversion plan offering documents that they could remain in their apartments, that (pursuant to this plan) they would not be evicted, and that any rent regulations governing their tenancies would continue to apply after the conversion was complete.
 
 E. RTC's Repudiation
 
 16
 In or about 1984, the plan sponsor pledged these nine apartments to Nassau Federal Savings and Loan Association as collateral for a loan of $3.2 million. When the sponsor defaulted in the summer of 1987, title to the nine apartments passed to Nassau Federal S & L. Pursuant to FIRREA, the Office of Thrift Supervision ("OTS") appointed RTC receiver of Nassau Federal S & L in March 1990. RTC then reorganized Nassau Federal S & L as a new thrift institution called Nassau Savings and Loan Association, F.A. At about the same time, OTS appointed RTC conservator of this new institution. On November 16, 1990, OTS issued Resolution Number 90-2003, providing that Nassau Savings and Loan would be closed, and appointing RTC as receiver. RTC is now responsible as receiver for disposing of the assets of this now-closed institution in a manner consistent with the requirements of FIRREA.
 
 
 17
 RTC sent the tenants two letters of repudiation, the first as conservator, the second as receiver. In the summer of 1990, RTC as conservator determined it was suffering a net operating loss as landlord of these nine units. On the basis of that loss (which was later calculated to be approximately $18,924 per month), RTC determined that the nine tenancies were burdensome within the meaning of 12 U.S.C. Sec. 1821(e)(1)(B), and notified each tenant in writing that RTC was repudiating the tenancy. It further advised that, pursuant to FIRREA, each tenant had the option of (a) treating the tenancy as terminated, (b) remaining in possession for the balance of the lease-term, or (c) purchasing the unit on stated terms.[1]
 
 
 18
 The nine tenants rejected the alternative offers made by RTC, and disputed RTC's power to repudiate their tenancies. Several of them filed complaints against RTC with the New York Division of Housing and Community Renewal ("DHCR"), to which complaints RTC responded that DHCR was "without jurisdiction over the RTC and this matter." The New York Attorney General then protested by letter to RTC that it had exceeded its power in repudiating tenancies protected by New York's Martin Act and the various rent laws and regulations. In response to the concerns raised by the Attorney General, RTC adopted a policy statement assuring New York that RTC would not repudiate the leases of low-income and moderate-income tenants. See RTC Statement of Policy for the Disposition of Residential Units Which Were Previously Subject to Rent or Securities Regulations (February 22, 1991) ("Statement of Policy"). In its second letter to the tenants, RTC advised that, pursuant to its Statement of Policy, no tenant of low-income or moderate-income would be subject to lease repudiation. The Statement of Policy declares that RTC will not repudiate the tenancy of any "individual whose income does not exceed 115% of the median income in the area involved, as determined by the U.S. Secretary of Housing and Urban Development, with adjustments for family size." Counsel for the New York Attorney General estimated at oral argument that the Statement of Policy would protect New York City residents with income (before family size adjustments) of up to approximately $45,000. It does not appear from the record, nor does any appellee contend, that any of the nine tenants at 444 East 57th Street are persons of low or moderate income.
 
 F. Procedural Events
 
 19
 On February 25, 1991, RTC filed a complaint naming as defendants the nine individual tenants, as well as Angelo Aponte (Commissioner of DHCR), and Robert Abrams (Attorney General of the State of New York). The complaint sought a declaration that RTC has the power to repudiate the tenancies in question, and an order of eviction against Ribner, who (the complaint alleged) holds no valid interest in the tenancy of his mother's apartment. RTC sought other relief as well, which we expressly decline to address. Soon thereafter, the Attorney General and DHCR filed a complaint against RTC, alleging that RTC lacked the statutory authority to pursue its claims, and requesting declaratory and injunctive relief against RTC. These actions were subsequently consolidated.
 
 
 20
 In February 1992, the parties filed cross-motions for summary judgment: RTC requested that the district court grant it the relief prayed for in its complaint; the Attorney General and DHCR asked for a declaration that RTC lacked statutory authority to evict "non-purchasing, rent-controlled or rent-stabilized tenants from condominium or cooperative units in buildings converted to condominium or cooperative status under a non-eviction plan filed ... pursuant to [the Martin Act]," and also requested a permanent injunction barring RTC from pursuing its claims. In addition, Ribner moved to dismiss RTC's complaint against him, and defendant Susan Patullo filed a motion to either dismiss RTC's complaint or, in the alternative, grant her summary judgment. (Patullo's motion apparently was never addressed below.) On August 21, 1992, after full briefing and argument, the District Court issued an opinion (a) granting New York's motion, (b) denying RTC's motion, and (c) granting Ribner's motion to dismiss the complaint against him. Resolution Trust Corp. v. Diamond, 801 F.Supp. 1152 (S.D.N.Y.1992).
 
 
 21
 In its opinion, the district court framed and answered two questions: "1) whether the tenants in this case have occupancy rights by virtue of leases or instead pursuant to statutory tenancies independent of any leases; and, 2) if these rights derive from statutory tenancies, whether the 'any contract or lease' language of section 1821(e)(1) empowers the RTC to repudiate statutory tenancies...." 801 F.Supp. at 1157. In addressing the first question, the district court examined the rent control and rent stabilization programs, as well as the Martin Act, and determined that tenants under these various schemes "enjoy occupancy rights that are independent of any lease they may have with their landlords, in this case the RTC." 801 F.Supp. at 1159. It then held that, because the nine tenants enjoy "rights of occupancy created by state statute and independent of any contract or lease between the landlord and tenant," those rights cannot be repudiated under "the plain language" of FIRREA authorizing RTC to repudiate "any contract or lease." 801 F.Supp. at 1161.
 
 
 22
 Having held that these tenancies were not within the scope of the express language of the statute, the district court went on to address RTC's alternative argument that there is an irreconcilable conflict between the state laws and FIRREA, such that application of the state regulations would obstruct RTC's operation under FIRREA. Applying "conflict preemption" analysis, the district court concluded that insofar as the statute did not expressly include "statutory" tenancies within its scope, it could not be construed to grant RTC any power with respect to these tenancies: "[s]ince the power prohibited by state law in this case was never granted to the RTC in the first place, no preemption of state law is possible here." 801 F.Supp. at 1164. Finally, the district court refused to grant summary judgment to either side on RTC's claim against Ribner, but did grant Ribner's motion to dismiss the complaint against him.
 
 
 23
 On appeal, RTC asserts express authorization in FIRREA allowing RTC to repudiate rent-regulated tenancies that it determines to be burdensome. RTC also argues that New York's rent regulations directly conflict with RTC's statutory mandate to maximize asset values and that, because compliance with both the state and federal laws is--with respect to these tenancies--impossible, the Supremacy Clause of the Constitution requires a finding that RTC's power to repudiate the leases of "non-needy" tenants preempts any non-federal rent regulation. We hold that these tenancies are grounded in a contract or lease and therefore fall within the express language of FIRREA and its grant to RTC of the power to repudiate "contracts or leases." Because we find that repudiation of these tenancies is within the scope of the express statutory grant of power to RTC, we find it unnecessary to reach the issue of "conflict preemption."
 
 
 24
 Accordingly, we reverse the district court's order, and direct that judgment be entered for RTC as to its power of repudiation. With respect to Ribner, we find that, although the district court was correct in denying the cross-motions for summary judgment, RTC did state a claim upon which relief may be granted, and we therefore vacate the dismissal of RTC's complaint against Ribner and remand for further proceedings.
 
 ANALYSIS
 A. FIRREA
 
 25
 RTC's power to repudiate contracts and leases was conferred by Congress as a tool for maximizing net asset values. The power is described in section 11 of the Federal Deposit Insurance Act ("FDIA"):
 
 
 26
 In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease--
 
 
 27
 (A) to which such institution is a party;
 
 
 28
 (B) the performance of which the conservator or receiver, in [its] discretion, determines to be burdensome; and
 
 
 29
 (C) the disaffirmance or repudiation of which the conservator or receiver determines, in [its] discretion, will promote the orderly administration of the institution's affairs.
 
 
 30
 12 U.S.C. Sec. 1821(e)(1). FIRREA expressly applies this provision to RTC. 12 U.S.C. Sec. 1441a(b)(4)(A). It is unquestionable that this provision grants RTC full discretionary power to disaffirm or repudiate any burdensome executory contract or lease. See, e.g., Resolution Trust Corp. v. CedarMinn Building Ltd. Partnership, 956 F.2d 1446, 1456 (8th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 94, 121 L.Ed.2d 56 (1992). This appeal therefore turns on whether the tenancies in question are contractual in nature or whether the various rent regulations transformed these tenancies into some non-contractual, non-leasehold property interest such that they are outside the scope of the statute.
 
 
 31
 For these purposes, the definition of the phrase "contract or lease" is a matter of federal law. See, e.g., Pennsylvania Dep't of Public Welfare v. Davenport, 495 U.S. 552, 557-8, 110 S.Ct. 2126, 2130-31, 109 L.Ed.2d 588 (1990) ("Our construction of the term 'debt' [in the Bankruptcy Code] is guided by the fundamental canon that statutory interpretation begins with the language of the statute itself."); Federal Deposit Ins. Corp. v. Philadelphia Gear Corp., 476 U.S. 426, 431, 106 S.Ct. 1931, 1934, 90 L.Ed.2d 428 (1986) (federal law governs meaning of "deposit" in federal statute). Although we are not bound by any state court pronouncements regarding the breadth or scope of these terms, we do consult for guidance the body of New York law concerning the design and operation of the rent regulation programs at issue. We also, of course, continue to defer to state courts' pronouncements regarding the definition of property interests. See Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). However, as we fully explain below, were we to find that New York law creates "statutory" tenancies not ultimately based on a lease or other voluntary contractual arrangement, we would have to consider whether such a statutory grant of a property interest amounts to the taking of private property without just compensation, in violation of the Fifth and Fourteenth Amendments to the United States Constitution.
 
 B. Regulated Tenancies
 
 32
 A tenancy is an interest in the exercise of dominion over property for a fixed or computable duration. Restatement (Second) of Property Sec. 1.4 (1977). A tenancy is initiated by a voluntary contractual arrangement between the landlord and tenant, typically memorialized in a written and signed lease. See, e.g., N.Y.Gen.Oblig.Law Sec. 5-703 (McKinney 1989) (tenancy for period exceeding one year must be evidenced by writing, signed by party to be charged). In many states, however, it is possible to create a tenancy of short duration by oral lease agreement, without any written evidence of the terms. Id.; see also Restatement (Second) of Property Sec. 2.1.
 
 
 33
 Only two terms are indispensable to the creation of a tenancy: the duration, or "term"; and the price, or "rent". In addition, lease terms typically impose other obligations on the landlord (such as the provision of various services, doormen, appliances, lighting of common areas, etc.) and on the tenant (such as maintaining the premises, avoiding excessive noise, timely reporting any needed repairs, etc.). The bundle of rights and duties will vary from tenancy to tenancy--the only common denominator being that every contract will specify rent and duration.
 
 
 34
 Although tenancy is premised on a voluntary contractual arrangement, certain obligations may be affected by operation of law. For example, regardless of any express terms to the contrary, virtually all states read a warranty of habitability into residential lease-contracts. See, e.g., N.Y.Real Prop.Law Sec. 235-b (McKinney 1989); Restatement (Second) of Property Sec. 5.1 (reporter's note listing states). Moreover, some states prohibit or refuse to enforce certain lease clauses. See, e.g., Conn.Gen.Stat.Ann. Sec. 47a-4 (West 1993) (unenforceable clauses include confession of judgment and tenant's consent to distraint of personal property). While these laws change the obligations of nonconforming contracts, the voluntary and contractual nature of the relationship remains. All terms unaltered by law continue to be enforceable obligations, and each party is free to continue or discontinue the tenancy in accordance with the terms of the contract.
 
 
 35
 New York and the nine tenants contend that New York's tight net of regulation creates a statutory tenancy that is in effect non-contractual, and beyond the reach of RTC's repudiation power. We address below each of the three regulatory systems cited and relied upon by New York and the rent-regulated tenants: (1) rent stabilization; (2) rent control; and (3) The Martin Act.
 
 1. Rent Stabilization
 
 36
 New York's rent stabilization laws regulate the two terms at the core of the landlord-tenant relationship: rent and duration. The regulations govern the initial rent, N.Y.C.Admin.Code Sec. 26-512b, 9 NYCRR Sec. 2521, restrict rent increases, N.Y.C.Admin.Code Sec. 26-512a, 9 NYCRR Sec. 2522, mandate lease renewal, N.Y.C.Admin.Code Sec. 26-511c(4), 9 NYCRR Sec. 2522.5(b)(1), and, upon the tenant's vacating of the premises, allow the tenancy to pass statutorily to certain members of the tenant's household so long as that individual has lived with the tenant since the inception of the tenancy or, in the case of the death of the tenant, for at least the two years immediately preceding the tenant's demise. 9 NYCRR Sec. 2523.5(b).
 
 
 37
 Landlord compliance with this scheme is enforced chiefly by limiting the grounds for eviction: "As long as the tenant continues to pay the rent ... no tenant shall be denied a renewal lease or be removed from any housing accommodation" except on specified grounds. 9 NYCRR Sec. 2524.1(a). Such grounds include the owner's desire to take possession for the owner's own use as a primary residence (Sec. 2524.4), and certain wrongful acts by the tenant (Sec. 2524.3). A landlord who fails to proffer a renewal lease will get no increase in rent until he comes into compliance with the Code. 9 NYCRR Sec. 2522.5(b)(2). The incentive in this provision ensures that virtually all rent-stabilized tenancies will be governed by a written lease-contract.
 
 
 38
 Rent stabilization is therefore lease-based in the sense that it operates through the regulation of lease terms. The program contemplates and requires a written lease-contract as the basis of tenancy. See 9 NYCRR Sec. 2520.12 ("The provisions of any lease or other rental agreement shall remain in force pursuant to the terms thereof, except insofar as those provisions are inconsistent with [the rent regulations] ..."). While statutory provisions alter or restrict important terms of the contract, the tenancy retains much of the character of a voluntary contract. Rent-stabilized tenancy is dependent upon a lease in these ways, and therefore is subject to RTC's repudiation power under Sec. 1821(e).
 
 2. Rent Control
 
 39
 New York's rent control statute does not contemplate or require a current written lease of the premises. Even though the original tenancies were created by written lease-contracts years (often decades) earlier, the landlord under rent control is not required to proffer a renewal lease at expiration, and the rent-control tenant is not required to sign one. So long as the tenant pays the rent, the landlord may not evict: "No tenant, so long as he or she continues to pay the rent ... shall be removed from any housing accommodation which is subject to rent control ... notwithstanding the fact that the tenant has no lease or that his or her lease ... has expired or otherwise terminated...." N.Y.C.Admin.Code Sec. 26-408a. The district court concluded therefore that the rent-controlled tenancy is something distinct from a property interest under a lease or contract. We disagree.
 
 
 40
 The rent-controlled tenancy bears many of the hallmarks of a contractual relationship. Indeed, it is difficult to see any other lawful basis for the landlord-tenant relationship. Under rent control, the landlord and tenant owe mutual obligations: the tenant is obligated to pay rent, and the landlord is obligated to provide a bundle of rights and services. The regulations provide that a landlord may not reduce the level of services that were provided to the tenant under the initial tenancy-creating contract. 9 NYCRR Sec. 2201.2 ("Every landlord shall furnish with housing accommodations the same dwelling space and the same essential services, furniture, furnishings and equipment as were furnished, or required to be furnished, on April 20, 1962 or any subsequent date determining the maximum rent."). The kind, level and schedule of services that the landlord owes the rent-control tenant is therefore determined by reference to the original lease-contract creating the tenancy. See 9 NYCRR Sec. 2200.13 ("The provisions of any lease or other rental agreement shall remain in force pursuant to the terms thereof, except insofar as those provisions are inconsistent with the Rent Law or these regulations."). Taken together, these two provisions enforce many of the original contractual elements of the tenancy. This being so, the landlord-tenant relationship is defined and governed by contract, rent control notwithstanding.
 
 
 41
 The courts of New York recognize that the terms of the last written lease continue to remain in effect under rent control. In Barrow Realty Corp. v. Village Brewery Restaurant, Inc., 272 A.D. 262, 70 N.Y.S.2d 545, 546 (1947), New York's intermediate appellate court considered whether or not a provision of the original lease (providing that the tenant shall pay the landlord's attorney fees in a proceeding brought because of tenant's default) survived the lease expiration, and concluded that "the clause ... is carried over, as are other provisions of the lease, to the tenant's occupancy during the period in which he remains in possession under the emergency rent law after the expiration of the term of the lease." The absence of any current written lease notwithstanding, the court held:
 
 
 42
 Default in the payment of the emergency rent is not merely a statutory default; it is a default under the lease.... [T]he continued occupancy permitted by the statute stems from the lease and the tenancy created thereby, and the emergency rent is fixed on the basis of the rental established in the lease. With the terms of the lease otherwise remaining in force, it may not fairly be said that the rent payable during the emergency period is merely a statutory rent and is not under the lease.
 
 
 43
 Id.; see also Hudson View Properties v. Weiss, 109 Misc.2d 589, 442 N.Y.S.2d 367, 370 (App.Term 1981) ("In the case of a statutory tenancy ... 'with the exceptions of the duration of the term, and the amount of rent payable, the rule established by the weight of authority is that insofar as the provisions of a lease which has expired are not in conflict with the then prevailing emergency rent statutes, and are not confined to the period of the expired lease, they are projected into the statutory tenancy, and will continue in effect during the term of the statutory tenancy.' " (quoting Rasch, New York Landlord and Tenant, 2d Ed., Sec. 286)), rev'd, 86 A.D.2d 803, 448 N.Y.S.2d 649 (1982), rev'd, 59 N.Y.2d 733, 463 N.Y.S.2d 428, 450 N.E.2d 234 (1983); 130 West 57 Corp. v. Hyman, 188 Misc. 92, 66 N.Y.S.2d 332, 334 (Sup.1946) ("The housing emergency calls for such stringent measures but it would be carrying the protection afforded a tenant to an unfair degree to hold that the obligations of the tenancy incorporated in the lease do not govern the relationship of landlord and tenant.... [T]he rights and obligations of the parties under the lease are projected into and become part of the statutory tenancy, except where they are plainly inconsistent with the Act.").[2]
 
 
 44
 Rent control, like rent stabilization, affects the lease by statutorily altering and specifying certain terms, chiefly by granting the tenant a statutory renewal option. That option to renew is exercised, at least tacitly, when the tenant continues in occupancy after receiving notice of the biennial rent adjustment made pursuant to the statute and regulations, N.Y.C.Admin.Code Sec. 26-405a(4), 9 NYCRR Sec. 2201.5, thereby agreeing to pay the new rent during the next two years. But rent control does not obliterate the lease.
 
 
 45
 Even were we to agree with New York that a rent-controlled tenancy is independent of any lease (which we do not), we would still hold that it is sufficiently rooted in contract to fall within the express language of FIRREA. While these tenancies are tightly regulated and policed, such a regime does not eliminate the contractual nature of the relationship, any more than do the regulatory schemes governing the provision of such services as electric power, natural gas, medallion taxi rides, or cable television. Some contracts are more heavily regulated than others, but they are not thereby transformed into something non-contractual or super-contractual.
 
 
 46
 The voluntary and contractual aspects of the rent-control arrangement distinguish it from the kind of housing measure invalidated by the New York Court of Appeals as an unconstitutional taking in Seawall Associates v. City of New York, 74 N.Y.2d 92, 544 N.Y.S.2d 542, 542 N.E.2d 1059, cert. denied, 493 U.S. 976, 110 S.Ct. 500, 107 L.Ed.2d 503 (1989). There, the Court of Appeals struck down a local ordinance requiring owners of properties used as single-room occupancy housing ("SROs") to rehabilitate their buildings for use as SROs indefinitely, and contrasted that ordinance with rent regulations such as those at issue in this case: "[t]he rent-control and other landlord-tenant regulations that have been upheld ... merely involved restrictions imposed on existing tenancies where the landlords had voluntarily put their properties to use for residential housing." 544 N.Y.S.2d at 548, 542 N.E.2d at 1064. The SRO ordinance was found to be a per se taking because its coercive design eliminated the voluntary and contractual nature of the landlord-tenant relationship, and " 'interfere[s] so drastically' ... with the SRO property owners' fundamental rights to possess and to exclude." 544 N.Y.S.2d at 548, 542 N.E.2d at 1065 (quoting Nollan v. California Coastal Comm'n., 483 U.S. 825, 836, 107 S.Ct. 3141, 3148, 97 L.Ed.2d 677 (1987), and citing Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435-36, 102 S.Ct. 3164, 3175-76, 73 L.Ed.2d 868 (1982)).
 
 
 47
 We conclude, therefore, that New York's statutory tenancies--whether under rent stabilization or rent control--are contract-based leaseholds. That being the case, they fall within the express language of Sec. 1821(e), and are subject to RTC's statutory power to repudiate. By repudiating the contract or lease creating the tenancy, RTC is effectively dissolving the tenancy. Once it has done so, no statutory or regulatory provision--at least none that can pass constitutional muster--can revive that tenancy.
 
 3. The Martin Act
 
 48
 The Martin Act, New York's blue sky law, alters our analysis not at all. "[N]o private action has been expressly authorized" in the Martin Act. CPC Int'l Inc. v. McKesson Corp., 70 N.Y.2d 268, 519 N.Y.S.2d 804, 807, 514 N.E.2d 116, 118 (1987). "[T]he specific purpose of the statute was to create a statutory mechanism in which the Attorney-General would have broad regulatory and remedial powers to prevent fraudulent securities practices...." Id. Most enforcement of the Martin Act is in the hands of the Attorney General, usually by means of a fraud action.
 
 
 49
 The Martin Act requires the offeror to reassure tenants in the offering documents that their rights under rent regulation will survive if they do not buy their apartments. The Act does not add to those rights in any way, however. The Attorney General enforces the offeror's obligation by his power to control the sale of securities. Thus the Martin Act forbids the sale of the cooperative or condominium shares unless the offering documents have been certified for filing by the Attorney General (and filed), and prohibits the Attorney General from certifying the offering documents for filing unless they contain the requisite disclosures and assurances. N.Y.Gen.Bus.Law Sec. 352-eeee2.
 
 
 50
 The Martin Act thus does no more than require that certain statements be included in the offering documents. It creates no private affirmative right and no private right of action. Rego Park Gardens Owners, Inc. v. Rego Park Gardens Associates, 191 A.D.2d 621, 595 N.Y.S.2d 492, 494 (1993) ("It is now well settled that there is no private cause of action under the Martin Act.") (citing CPC Int'l v. McKesson Corp., 70 N.Y.2d 268, 519 N.Y.S.2d 804, 514 N.E.2d 116 (1987); Vermeer Owners v. Guterman, 78 N.Y.2d 1114, 578 N.Y.S.2d 128, 585 N.E.2d 377 (1991); Board of Managers of Fairways at North Hills Condominium v. Fairways at North Hills, 150 A.D.2d 32, 545 N.Y.S.2d 343 (1989)). Non-purchasing tenants of a condominium subject to a Martin Act conversion plan hold their tenancies by contract (however that contract may have been shaped and extended by legislation), and these tenancies are therefore subject to repudiation by the RTC.
 
 C. Congressional Intent
 
 51
 If it chooses, Congress can grant disaffirmation or repudiation power in a way that preserves state regulated leases and contracts. For example, under the Bankruptcy Code a trustee in bankruptcy is granted power to "assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. Sec. 365(a). In In re Friarton Estates Corp., 65 B.R. 586 (Bankr.S.D.N.Y.1986), the court held that a debtor-lessor could not use that provision to repudiate leases that were subject to New York's rent control laws. New York's brief on the present appeal, and the opinion of the district court, rely heavily on Friarton. However, as Bankruptcy Judge Prudence Abram noted in Friarton, the Bankruptcy Code includes an express provision allowing the tenant to effect "any renewal or extension of such term that is enforceable by such lessee under applicable nonbankruptcy law." 65 B.R. at 593 (quoting 11 U.S.C. Sec. 365(h)(1)). Friarton bars the debtor from exercising the power to repudiate leases that are rent-controlled or rent-stabilized, because the tenant's right to renew and extend the tenancy is conferred by "applicable nonbankruptcy law".
 
 
 52
 The express deference to "applicable nonbankruptcy law" in the Bankruptcy Code which saves from repudiation lease renewal rights enforceable under rent control, has no counterpart in FIRREA or FDIA. The bankruptcy provision has been in the Code since its inception in 1978. Pub.L. No. 95-598, 92 Stat. 2574 (1978). When Congress enacted FIRREA in 1989, Congress borrowed and adopted many of the provisions of the Bankruptcy Code dealing with a lessee's rights when the debtor-lessor rejects a lease contract. See S.Rep. No. 19 at 314 (12 U.S.C. Sec. 1821(e) was "closely modeled on parallel provisions of section 365 of the Bankruptcy Code."). It is telling that the only relevant feature that Congress omitted from 12 U.S.C. Sec. 1821(e)(5) was the one that grants the lessee a right to exercise his renewal or extension options under "applicable nonbankruptcy law."[3] This alone strongly signifies Congressional intent to grant RTC greater powers in this respect than those given to a bankrupt debtor. See Wheeler v. Greene, 280 U.S. 49, 51, 50 S.Ct. 21, 21, 74 L.Ed. 160 (1929) ("When so important a grant of power contained in the prototype is left out from the copy it is almost impossible to attribute the omission to anything but design, or to believe that it left to very attenuated implications what the model before it so clearly expressed.").
 
 
 53
 The textual distinction between FIRREA/FDIA and the Bankruptcy Code is reinforced by functional considerations. Without the deference to "applicable nonbankruptcy law" in the Code, prospective bankrupts could achieve solvency by acquiring rent-regulated properties before filing under Chapter 11 so that the rent-regulated leases could be alchemized by repudiation. Thus the Code's bar on the repudiation of rent-regulated leases prevents the use of the bankruptcy process as a device for emptying rent-controlled properties.
 
 
 54
 These same concerns do not arise in the FIRREA context. RTC does not acquire properties for speculation and is not actively seeking to acquire rent-regulated properties in order to repudiate leases. Under its statutory mandate, RTC simply disposes of properties that come into its hands from failed financial institutions. Absent any likelihood of predatory behavior by RTC as receiver or conservator, there was no reason for Congress to restrict the kinds of tenancies subject to its repudiation powers, and every reason for Congress to strengthen RTC's hand in remedying a national economic emergency.
 
 D. Post-Repudiation Occupancy Rights
 
 55
 Once RTC repudiates a lease, a tenant may choose to "remain in possession of the leasehold interest for the balance of the term of the lease...." 12 U.S.C. Sec. 1821(e)(5)(A)(ii). New York and the tenants argue that, even if a statutory tenancy is a leasehold, New York law makes the leasehold perpetual, and that RTC therefore is not entitled to evict them even if RTC has power to repudiate the leases. If the leasehold were truly perpetual, this argument would mandate affirmance of the result reached by the district court.
 
 
 56
 How long is "the balance of the term of the lease" when the RTC repudiates a rent-regulated New York tenancy? Since tenancies under the rent stabilization law are expressly lease-based, Sec. 1821(e)(5)(A)(ii) allows the tenant to continue the tenancy on existing terms until the end of the lease term during which the notice of repudiation is given.
 
 
 57
 Rent-controlled tenancies, however, do not run for any specified term. There are two conceivable arguments for the idea that the term is perpetual: first, by analogy to perpetual written leases under New York law; second, by reference to the potentially lifelong and inheritable nature of rent-controlled occupancy.
 
 
 58
 Under New York law, a perpetual lease can be created by the grant of a fee interest in property coupled with the grantor's reservation of a right to collect rent forever. See First Religious Society in Whitestown v. Socony Mobil Oil Co., 44 Misc.2d 415, 253 N.Y.S.2d 839, 842 (Sup.Ct.1964) (grant of fee interest in property, where grantor reserves right to collect rent in perpetuity, creates landlord-tenant relationship under a perpetual lease). Such an arrangement, however, is disfavored by the law and can come into being only if the lease itself clearly provides for perpetual tenancy. See Garner v. Gerrish, 63 N.Y.2d 575, 483 N.Y.S.2d 973, 975, 473 N.E.2d 223, 224 (1984). In the absence of an express lease duration (or an express term of perpetuity), New York law assigns a lease term, usually a short one. See N.Y.Real Prop. Law Sec. 232 (McKinney 1989) (where parties fail to specify, lease of New York City property ends October 1 following possession); see also Restatement (Second) of Property Sec. 1.5, and Comment (d) to that section ("Where the parties enter into a lease of no stated duration and periodic rent is reserved or paid, a periodic tenancy is presumed. The period thus presumed is equal to the interval for which rent is reserved or paid to a maximum periodic tenancy of year to year."); N.Y.Real Prop.Law Secs. 232-a (notice to terminate month to month tenancy in New York City), 232-c (holding over of tenant after expiration of term; effect of landlord's acceptance of rent); 28 Mott Street Co. v. Summit Import Co., 34 A.D.2d 144, 310 N.Y.S.2d 93 (1970) (occupancy of premises for six years, bimonthly payments and unexecuted ten year lease, together created year to year tenancy), aff'd, 28 N.Y.2d 508, 319 N.Y.S.2d 65, 267 N.E.2d 880 (1971).
 
 
 59
 New York contends that a rent-controlled lease term ends when the right of occupancy ends, which would allow a repudiated lease to run under Sec. 1821(e)(5)(A)(ii) for the lives of the tenant, the tenant's spouse or life companion, and of their issue. However, the power of repudiation under section 1821(e) was conferred in aid of an acute financial emergency, and cannot be construed fairly to accommodate so prolonged a residual tenancy. In any event, we cannot use these statutory occupancy rights to delimit the leasehold for FIRREA purposes because the statutory tenancy is by definition limited to the life of the statute, and therefore cannot outlive the declared end of the wartime housing emergency that the statute purports to remediate. Moreover, the temporary nature of the rent control laws is needed to insulate them from constitutional challenge. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 440, 102 S.Ct. 3164, 3178, 73 L.Ed.2d 868 (1982) ("This Court has consistently affirmed that States have broad power to regulate ... the landlord-tenant relationship.... In none of these cases, however, did the government authorize the permanent occupation of the landlord's property by a third party." (citations omitted)); Block v. Hirsh, 256 U.S. 135, 157, 41 S.Ct. 458, 460, 65 L.Ed. 865 (1921) ("A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change.").
 
 
 60
 Rent-controlled tenancy under New York law is therefore neither perpetual nor measured by the life of the tenant (and the tenant's successors). New York law provides two intervals that can be used to fix the term of a rent-controlled tenancy. Under N.Y.Real Prop.Law Sec. 232, a lease agreement for real property in New York City that fails to specify a duration is deemed to end on the October 1 next following the date that the tenant occupies the premises. That rule, however, is evidently designed to supply a missing term in an unregulated contract. Since a specific body of New York law regulates rent-controlled tenancies, and since that body of law extended the tenancy, we first consider whether that body of law divides the tenancy into periods analogous to lease terms. Since it does, we look no further. Under rent control the lease term ends, for purposes of Sec. 1821(e), on the biennial January 1 date on which the landlord next becomes entitled (following the notice of repudiation) to a review of the maximum base rent. See N.Y.C.Admin.Code Sec. 26-405a(4)). Therefore, the term of a rent controlled tenancy is two years, commencing on the January 1 of the last biennial review set by the statute prior to notice of repudiation.
 
 E. Other Arguments
 
 61
 New York argues that, even if RTC has the power to repudiate these tenancies, RTC has violated its statutory mandate in repudiating the nine tenancies at issue on this appeal. First, New York contends that there was no proper basis for RTC's determination that these leases are "burdensome". RTC, as conservator or receiver, may repudiate contracts or leases "the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome." 12 U.S.C. Sec. 1821(e)(1)(B). New York contends that "burdensomeness" must be evaluated in terms of RTC's statutory mandate to "maximize the net present value return" on asset disposition. Underlining the word "present," New York argues that "Congress instructed RTC to focus" on the asset's "current value, not its value at some future date," and that the "current value" of the nine condominium apartments is their value under rent control and rent stabilization.
 
 
 62
 We are unpersuaded. The "current" value of any rented property is of course affected by a leasehold interest; but that happens regardless of whether the leasehold is "statutory." The point is that Congress has expressly conferred a power of repudiation that allows RTC to realize "current" value of property free of such leaseholds. Moreover, Congress instructed RTC to exercise its discretion in determining which contracts or leases are burdensome, pursuant to an overarching mandate to "maximize the net present value return" on assets in its possession. It is uncontroverted that (a) these tenancies are causing RTC to lose close to $19,000 per month and (b) these occupied rent-regulated units are worth millions of dollars less than they are worth vacant or free of rent regulations. It cannot be said therefore that RTC abused its discretion in finding these tenancies burdensome.
 
 
 63
 Next, New York argues that "if RTC prevails in this case, it will be empowered to proceed to repudiate [other] statutory tenancies" and this "will have a far-reaching effect" on New York's housing market. This, according to New York, violates RTC's obligation "to consider the adverse impact of its actions on local communities" inasmuch as "thousands of long-term tenants [will be] suddenly evicted from their homes."
 
 
 64
 New York points to RTC's obligation to minimize the impact of its assets dispositions on "local real estate and financial markets." 12 U.S.C. Sec. 1441a(b)(3)(C)(ii). As to these nine tenancies--the only ones at issue at this time--even the simultaneous sale of all nine would have no more than a de minimis impact on the market. As to all others, we simply lack sufficient information to tell.[4] For example, we do not know how many of these units have below-market rents, how many might be occupied by tenants whose income renders the tenancy ineligible for repudiation under RTC's Statement of Policy, how many tenancies RTC will exercise its statutory discretion to repudiate, which ones out of that number will be purchased by the current tenants, over what time the remaining units would come on the market, whether RTC would spread unit sales over time to advance its own interest in maintaining a firm market, and how RTC might otherwise exercise its discretion (conferred by Congress) to avoid adversely impacting the market. Until RTC exercises its discretion to actually repudiate an appreciable number of additional tenancies, a court is not in a position to consider whether or not RTC's conduct falls within the rather nebulous statutory parameters, or even who (if anyone) would have standing to raise the issue.[5]
 
 
 65
 Finally, New York urges that any repudiation of these "statutory" tenancies will constitute a taking without just compensation in violation of the Fifth Amendment of the Constitution. This argument fails for at least two reasons. First, New York assumes there is a property interest here warranting compensation if "taken." However, any property interest in a temporary estate, by definition, can extend only to the end of the term of that estate. We have already decided that each tenant has the option of remaining in possession through the end of the tenancy's term: so nothing is being "taken." Second, New York in its brief identifies the thing taken as "[l]easehold interests." But Sec. 1821(e) expressly authorizes the repudiation of leases, and in several places refers to the repudiation of a tenant's "leasehold interest." See 12 U.S.C. Secs. 1821(e)(5)(A)(ii) and (B). The state's regulatory overlay certainly makes these tenancies more advantageous, but that simply reinforces RTC's finding that they are burdensome.
 
 F. Conflict Preemption
 
 66
 Having held that Sec. 1821(e) expressly authorizes RTC to repudiate the tenancies at issue, we have no occasion to reach or address "conflict" preemption, a provocative issue thoroughly considered by the district court. 801 F.Supp. at 1162-64. We note, however, that the Resolution Trust Corporation Completion Act, Pub.L. No. 103-204, 107 Stat. 2369 (1993), signed into law three days before the oral argument of this appeal, contains the following provision under the heading "RTC Management Reforms" (and the subheading "contracting procedures"): "[n]othing in this Act, or any other provision of law, shall supersede the [RTC's] primary duty of minimizing costs to the taxpayer and maximizing the total return to the Government." 12 U.S.C. Sec. 1441a(w)(19)(B). Inasmuch as the affirmation or disaffirmation of a contract is arguably a "contracting procedure," this could be read to accomplish the preemption of state rent regulations, to the extent they interfere with RTC's mandate. We are not required to reach this issue, however.
 
 G. Ribner's Claim to Tenancy
 
 67
 Lloyd Ribner alleges that he holds his tenancy by succession from his mother, Muriel Ribner. For this succession to be valid under New York's rent regulations, he must have resided in his mother's apartment at least for two years immediately prior to her death. 9 NYCRR Sec. 2204.6(d)(1). In support of its motion for summary judgment, RTC presented evidence that Ribner had moved into the apartment only several weeks before his mother's death, and that within several days of her demise he had once again vacated the premises. Ribner provided rebuttal evidence in the form of an affidavit stating that he "resided with her contemporaneously for several years prior to her death...." On this basis, the District Court found there to be a disputed material fact in issue, and denied both parties' motions for summary judgment.
 
 
 68
 When a moving party has supported his motion with an affidavit, Rule 56(e), Fed.R.Civ.P. requires that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." We cannot say that Ribner failed to satisfy this requirement. That depends on whether, given the artful phrasing of his affidavit, his having "resided with [his mother] contemporaneously" means (as it is calculated to suggest) that he resided with her continuously for the period of "several years"; that "several" means two or more; and that "prior" means immediately prior. Nothing less or different would satisfy the minimum statutory requirement. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986) (to successfully oppose motion for summary judgment, non-moving party must demonstrate more than "some metaphysical doubt as to the material facts, ... [it] must come forward with 'specific facts showing that there is a genuine issue for trial.' ") (quoting Fed.R.Civ.P. 56(e)). Notwithstanding these possible ambiguities, we conclude that the district court correctly denied both parties' motions for summary judgment on this issue.
 
 
 69
 The district court also dismissed the complaint against Ribner, because it could find "no indication that [thirty days' notice of intent to regain possession, required by New York rent control law] was ever served upon Ribner." 801 F.Supp. at 1164. This conclusion is wholly inconsistent with Ribner's admission (through his incorporation by reference of portions of the affidavit filed by another tenant) that he received a letter on August 17, 1990 indicating RTC's intent to repudiate the tenancy. That letter was received a full six months prior to the filing of RTC's complaint, and thus fully satisfies any thirty-day notification requirement. We therefore vacate the District Court's dismissal of RTC's complaint.
 
 CONCLUSION
 
 70
 Title 12 U.S.C. Sec. 1821(e) expressly authorizes RTC to "disaffirm or repudiate" tenancies subject to New York's rent stabilization and rent control laws--these tenancies being based in contract or lease. We therefore reverse the District Court's order, and direct it to enter summary judgment for RTC on the issue of RTC's power to repudiate these tenancies. As to defendant-appellee Lloyd Ribner, we affirm the district court's refusal to grant summary judgment, and vacate the district court's order dismissing the complaint. We also remand for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 Ribner contends that any such correspondence was sent to his deceased mother, Muriel Ribner. As we discuss below, with respect to this individual, that contention has no material effect on this appeal
 
 
 [2]
 See also 65 Central Park West, Inc. v. Greenwald, 127 Misc.2d 547, 486 N.Y.S.2d 668, 672 (N.Y.City Civ.Ct.1985) ("The fact that the original lease has expired is irrelevant because the terms and conditions of that lease are said to continue in the context of the rent controlled statutory tenancy." (citation omitted)); Stephen Estate, Inc. v. Kaplan, 198 Misc. 948, 100 N.Y.S.2d 455, 460-61 (N.Y.City Mun.Ct.1950) ("The conventional relationships of landlord and tenant, with privity of contract and privity of estate, existed ... prior to the expiration of the lease. That under the Emergency Housing Laws, the provisions of a lease, except for the term and the rent reserved are projected into and become a part of the statutory tenancy is now beyond question." (citations omitted))
 
 
 [3]
 Compare 11 U.S.C. Sec. 365(h)(1) ("If the trustee rejects an unexpired lease of real property of the debtor under which the debtor is the lessor ... the lessee ... may treat such lease ... as terminated by such rejection ... or, in the alternative, the lessee ... may remain in possession of the leasehold ... for the balance of such term and for any renewal or extension of such term that is enforceable by such lessee ... under applicable nonbankruptcy law.") with 12 U.S.C. Sec. 1821(e)(5)(A) ("If the conservator or receiver repudiates an unexpired written lease of real property ... the lessee under such lease may either--(i) treat the lease as terminated by such repudiation; or (ii) remain in possession of the leasehold interest for the balance of the term of the lease unless the lessee defaults under the terms of the lease after the date of such repudiation.")
 
 
 [4]
 According to RTC, however, it currently holds approximately 274 rent-regulated cooperative or condominium units, which represents approximately .015% of the 1,884,000 residential rental units in New York City. Accepting arguendo New York's contention that this number could be closer to 1,000, this would still only amount to .053% of the rental market
 
 
 [5]
 New York expresses concern for the "far reaching effects on the tenants." However, any impact on tenants will be mitigated by RTC's express policy not to exercise its repudiation power with respect to families of low and moderate income. Under the current Statement of Policy (and pursuant to 12 U.S.C. Sec. 1441a(b)(3)(C)(v)), the only rent-regulated tenants who would be exposed to possible repudiation of their tenancies are those with income (according to the figure proffered by New York at oral argument) in excess of $45,000 per year